# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00667-CV

**Michael C. Scally, M.D., Appellant**

**v.**

**Texas State Board of Medical Examiners, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
NO. D-1-GN-05-001134, HONORABLE DARLENE BYRNE, JUDGE PRESIDING**

## O P I N I O N

Michael C. Scally, M.D., appeals the district court's judgment affirming the final order of the Texas State Board of Medical Examiners (the Board), which revoked his license to practice medicine in Texas. The Board ordered the license revocation after determining that Scally violated the Texas Medical Practice Act, Tex. Occ. Code Ann. §§ 151.001-167.202 (West 2004 & Supp. 2010), by prescribing anabolic steroids to patients without a valid medical purpose and by failing to keep adequate medical records for some of those patients. In six issues, Scally contends that the district court erred by affirming the Board's final order. We will affirm the district court's judgment because we find no error in the Board's final order and conclude that it was supported by substantial evidence.

## BACKGROUND

The Board's staff sought to revoke Scally's medical license by filing a complaint against Scally with the Board and at the State Office of Administrative Hearings in August 2002.[1] The complaint alleged in essence that Scally had prescribed anabolic steroids to healthy patients for the improper purpose of bodybuilding.[2] Throughout the proceedings, Scally admitted to prescribing anabolic steroids, but maintained that he only prescribed the drugs to improve the patients' overall health and to treat medical conditions like steroid-induced hypogonadism or associated symptoms, not for the purpose of bodybuilding.[3]

After an unsuccessful mediated settlement conference, the case went to an administrative law judge (ALJ) for a contested-case hearing. The Board amended its complaint in July 2003, alleging that Scally violated the Medical Practice Act by improperly prescribing anabolic steroids to nine patients and failing to keep adequate medical records and to conduct appropriate testing for those patients. *See id*. §§ 164.001; .051(a)(1), (3), (6); .052(a)(5); .053(a)(1), (5), (6). At the contested-case hearing, Scally took the position that prescribing anabolic steroids along with other medications to stimulate the hypothalamic-pituitary-testicular axis (HPTA) is the proper

---

[1] The facts recited herein are taken from the administrative record on appeal, including the testimony and exhibits admitted at the contested-case hearing.

[2] Section 481.071 of the health and safety code provides in part that anabolic steroids may only be prescribed for "a valid medical purpose," and "bodybuilding, muscle enhancement, or increasing muscle bulk or strength through the use of an anabolic steroid or human growth hormone listed in Schedule III by a person who is in good health is not a valid medical purpose." Tex. Health & Safety Code Ann. § 481.071(b)(1), (c) (West 2010).

[3] The parties defined "hypogonadism" as inadequate function of the reproductive organs (testes in men, ovaries in women), which manifests as deficient sex-hormone secretion. "Steroid-induced hypogonadism" is subnormal or impaired production of sex hormones caused by taking anabolic steroids.

2

standard of care for reducing the severity and duration of steroid-induced hypogonadism.[4] He also asserted that he performed the proper diagnostic tests before prescribing anabolic steroids and that he maintained adequate medical records for these patients.

The ALJ conducted an eleven-day evidentiary hearing, during which the Board offered the expert testimony of two board-certified endocrinologists, Dr. Harold Werner and Dr. Jeffrey Jackson. Scally offered his own testimony along with expert testimony from Dr. Mauro DiPasquale, a doctor licensed in Ontario, Canada, who has practiced sports medicine for thirty years.[5] In addition, Scally offered testimony from Greg Seal, a patient treated by Scally beginning in 2000 (after most of the patients cited in the Board's complaint), and Andrew Hodge, Scally's assistant as of January 2000. The parties also submitted post-hearing briefing to the ALJ.

After the record was closed, the ALJ issued a proposal for decision that included 271 findings of fact and 25 conclusions of law. For each of the nine patients at issue, the ALJ analyzed the Board's factual allegations and whether Scally had violated the Medical Practice Act or the Board's rules by (1) prescribing anabolic steroids to the patients outside the standard of care, (2) failing to keep adequate medical records for them, and (3) failing to conduct appropriate tests to rule out diagnoses other than hypogonadism. The ALJ concluded that Scally (1) violated the

---

[4] The hypothalamic-pituitary-testicular axis (HPTA) refers to the interdependent relationship between the glands, hormones, and enzymatic factors involved in the eventual production and regulation of sex hormones.

[5] Dr. DiPasquale's medical-school internship was in general and internal medicine. In addition to his general private practice, he specialized in bariatric medicine and sports medicine. Although he has not had formal training in endocrinology, he has been certified by the Medical Review Officer Certification Council to perform and interpret drug testing in sports. He is the president of the United World Power Lifting Federation and the Pan American Power Lifting Federation and is a former medical director of the World Bodybuilding Federation and the World Wrestling Federation.

standard of care by prescribing anabolic steroids to patients M.W., J.S., J.M., T.W., J.B., J.Bi., S.L., and S.D. without a valid medical purpose and for the purpose of bodybuilding; (2) failed to practice medicine in an acceptable professional manner consistent with the public health and welfare; (3) committed unprofessional or dishonorable acts that were likely to deceive or defraud the public; and (4) prescribed controlled substances to these patients in a manner inconsistent with public health and welfare.[6] *See id*. §§ 164.051(a)(1), .052(a)(5), .053(a)(1), (5); Tex. Health & Safety Code Ann. § 481.071 (West 2010). The ALJ concluded that Scally's conduct was intentional based on his pattern of marketing to people interested in bodybuilding and providing them with anabolic steroids. The ALJ also concluded that Scally failed to maintain adequate medical records for T.C., M.W., J.S., T.W., J.B., and J.Bi. After considering both the aggravating and mitigating factors provided as guidelines in the Board's rules, the ALJ recommended that Scally's license be revoked and that the Board assess an administrative penalty against him in the amount of $190,000, as well as transcription costs of $12,809.50.[7] The Board reviewed the ALJ's proposal for decision and adopted it in full. Scally sought judicial review of the Board's order in district court. After a hearing on the merits, the district court affirmed the Board's final order. This appeal followed.

---

[6] The ALJ determined that the Board did not establish for any of the patients that Scally failed to conduct the appropriate tests to rule out diagnoses other than hypogonadism.

[7] The ALJ recommended that the Board sanction Scally with the maximum penalty of $5,000 for each of the 32 times that Scally prescribed anabolic steroids below the standard of care and $5,000 for each of the six times that Scally failed to maintain adequate medical records, for a total penalty of $190,000. *See* Tex. Occ. Code Ann. § 165.003 (West 2004).

**STANDARD OF REVIEW**

The substantial-evidence standard of the Texas Administrative Procedure Act (APA) governs our review of the Board's final order. *See* Tex. Gov't Code Ann. § 2001.174 (West 2008). The APA authorizes reversal or remand of an agency's decision that prejudices the appellant's substantial rights because the administrative findings, inferences, conclusions, or decisions (1) violate a constitutional or statutory provision, (2) exceed the agency's statutory authority, (3) were made through unlawful procedure, (4) are affected by other error of law, or (5) are arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. *Id.* § 2001.174(2)(A)-(D), (F).

The APA also authorizes a reviewing court to test an agency's findings, inferences, conclusions, and decisions to determine whether they are reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole. *Graff Chevrolet Co. v. Texas Motor Vehicle Bd.*, 60 S.W.3d 154, 159 (Tex. App.—Austin 2001, pet. denied); *see* Tex. Gov't Code Ann. § 2001.174(2)(E). Under this deferential standard, we presume that the Board's order is supported by substantial evidence, and Scally bears the burden of proving otherwise. *Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc.*, 665 S.W.2d 446, 453 (Tex. 1984). The burden is a heavy one—even a showing that the evidence preponderates against the agency's decision will not be enough to overcome it, if there is some reasonable basis in the record for the action taken by the agency. *Id.* at 452. Our ultimate concern is the reasonableness of the agency's order, not its correctness. *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984).

Whether the agency's order satisfies the substantial-evidence standard is a question of law. *Id.* Thus, the district court's judgment that there was substantial evidence supporting the Board's final order is not entitled to deference on appeal. *Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam). On appeal from the district court's judgment, the focus of the appellate court's review, as in the district court, is on the Board's decision. *See Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 562 (Tex. 2000); *Tave v. Alanis*, 109 S.W.3d 890, 893 (Tex. App.—Dallas 2003, no pet.).

We review the Board's legal conclusions for errors of law and its factual findings for support by substantial evidence. *Heat Energy Advanced Tech., Inc. v. West Dallas Coal. for Envtl. Justice*, 962 S.W.2d 288, 294-95 (Tex. App.—Austin 1998, pet. denied). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact." *Lauderdale v. Texas Dep't of Agric.*, 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ) (quoting *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988)) (internal quotation marks omitted). Thus, we will sustain the agency's action if the evidence as a whole is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action. *Texas State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988).

We may not substitute our judgment for that of the Board on the weight of the evidence on questions committed to agency discretion. *Charter Med.*, 665 S.W.2d at 452; *see also* Tex. Gov't Code Ann. § 2001.174. The ALJ, as factfinder, determines the credibility of witnesses and the weight of their testimony. *Granek v. Texas State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 778 (Tex. App.—Austin 2005, no pet.). We may not set aside an agency decision merely because

6

testimony was conflicting or disputed or because it did not compel the agency's decision. *See Brinkmeyer*, 662 S.W.2d at 956. Consequently, if the evidence would support either affirmative or negative findings on a specific matter, we must uphold the agency's decision. *Charter Med.*, 665 S.W.2d at 453.

## DISCUSSION

Scally asserts that the district court erred by affirming the Board's final order for several reasons. Scally contends in his first issue that the process provided by the APA for judicial review of the Board's final order violated his rights to due process and equal protection by denying him a jury trial and subjecting him to the substantial-evidence standard of review. In his second issue, Scally argues that the testimony of the Board's expert witnesses should have been excluded because the experts were not qualified, and thus their testimony was neither reliable nor relevant. Scally asserts in his third issue that substantial evidence does not support the Board's findings of fact and the revocation of his license. In this issue, Scally challenges approximately 183 of the 271 findings of fact. In his fourth and fifth issues, Scally challenges an additional 13 of the 271 findings of fact. He asserts that the Board engaged in ad hoc rulemaking, and its interpretation of the administrative code exceeded its statutory authority, resulting in an erroneous finding that the patients' medical records were inadequate. In his sixth issue, Scally challenges the Board's contention in the district court that his motion for rehearing was insufficiently definite to preserve error.

**Relevant scientific background and evidence presented**

To provide context for the issues raised by Scally, we will briefly explain the nature of Scally's practice, how anabolic steroids work and their effect on the human body's natural production of sex hormones, and the concepts underlying Scally's method for treating patients with steroid-induced hypogonadism.

### *Origin of Scally's practice*

The evidence presented at the contested-case hearing reflects that Scally received undergraduate degrees in life sciences and chemistry from the Massachusetts Institute of Technology in 1975. Scally continued with a post-graduate fellowship at MIT in the division of brain sciences and neuroendocrinology. Scally graduated from Harvard Medical School in 1980 and received his medical license in 1981. He specialized in anesthesiology until approximately 1995.

In September 1995, he opened an office in Houston, the Texas Longevity and Wellness Center, where his practice focused on preventive medicine. In an introductory letter that Scally provided to patients, he declared that "[t]urning back the clock on the aging process is now possible" and "[t]hrough science, technology, and medicine we can attain and maintain a level of youthfulness previously impossible." He offered special packages for those interested in multiple programs and a $50 credit for referring a new patient. Although the marketing materials included with the patients' medical records show that the center offered a number of treatment programs, including among others, BodyBuilding, Weight Loss, Erection Dysfunction, and Hormone Replacement, Scally did not offer programs for either HPTA normalization or cessation of anabolic-steroid use.

Scally testified that between 1994 and 1995 he became interested in researching and developing a method for helping patients suffering from steroid-induced hypogonadism to return their HPTA to normal. He had begun exercising "a lot"—running, weightlifting, and doing aerobics—and began hearing from many people at the gym about medical problems they were having when they tried to stop using illicit anabolic steroids.[8] Although anabolic steroids have certain therapeutic uses, these people were using them to increase their muscle mass and strength. Scally testified that he was disturbed by their reports of dismissive treatment from doctors when they sought help stopping their steroid use, so he began discussing the issue with his trainer and researching the HPTA.

### *Anabolic steroids and the HPTA*

In his expert report and testimony at the contested-case hearing, Scally explained the effect of anabolic steroids on the HPTA. The HPTA, as noted earlier, refers to the complex interdependent relationship between the endocrine glands in the male (hypothalamus, pituitary gland, and testes), the hormones that the glands secrete, and the enzymatic factors involved in the eventual production and regulation of sex hormones. Anabolic steroids are a class of drugs that are based upon the structure of the main sex hormone naturally occurring in men, testosterone, which is produced by the testes.[9] "Anabolic" means that the drugs promote cell growth, particularly muscle

---

[8] Scally stated in his motion for rehearing that he was training for the Mr. Texas competition during this time period.

[9] Scally also referred to anabolic steroids as "androgenic-anabolic steroids," "AAS," and "androgens" in his testimony and briefing, but for clarity we will use only the term "anabolic steroids."

mass. The Board's experts testified that this increase in muscle mass and strength is what leads bodybuilders, weight lifters, and other athletes to seek out black-market steroids. Anabolic steroids also have androgenic effects, which means that they affect the development and maintenance of masculine secondary sexual characteristics (e.g., increased growth of body and facial hair, thickening of the vocal cord).[10]

Taking these drugs disrupts the body's natural equilibrium, sometimes causing the body to stop producing testosterone on its own. Scally testified that each individual male has his own specific equilibrium point for testosterone. If a man takes enough anabolic steroids to meet his equilibrium point, his HPTA will shut down because the body no longer needs to work to produce testosterone on its own. Consequently, when the anabolic steroids are stopped, the body may be in a state of hypogonadism because the sex glands (testes in men; ovaries in women) are producing little or no hormones.[11]

The amount of anabolic steroids that it takes to shut down the body's natural production of sex hormones is unknown. According to Scally, an individual who stops taking anabolic steroids will suffer from marked muscle loss and steroid-induced hypogonadism. The Board's experts acknowledged that no one knows exactly how long a patient will suffer with hypogonadism or secondary hypogonadism after taking anabolic steroids and then stopping them.

---

[10] The manifestation of these androgenic effects is also referred to as masculinization or virilization.

[11] Hypogonadotrophic hypogonadism (secondary hypogonadism) can also occur when a person stops taking anabolic steroids. Secondary hypogonadism is a disorder in which the pituitary gland has ceased functioning properly and is not producing the hormones it normally does, which stimulate testosterone secretion by the testes.

While some research that Scally cited in his expert report has shown that the body's natural production of sex hormones will spontaneously return to normal shortly after the anabolic steroids are stopped, there are other documented cases of steroid-induced hypogonadism lasting from six months to over two years.

### *Scally's HPTA treatment method*

Scally testified about his procedure for determining whether a patient had hypogonadism. Scally would take a history and perform a physical exam, and then he would order blood tests to check the patient's thyroid-stimulating hormone level, prolactin level, luteinizing-hormone level, and total testosterone level. Depending on the various hormone levels, the patient's diagnosis could be primary hypogonadism (testicular dysfunction), secondary hypogonadism (hypothalamic pituitary dysfunction), or mixed hypogonadism, which is a combination of the two.

When Scally first began treating patients with a history of steroid use for HPTA dysfunction in 1995, he did not prescribe anabolic steroids. Instead, he prescribed two drugs that he believed would stimulate the HPTA, human chorionic gonadotropin (hCG) and clomiphene citrate (commonly known as Clomid). hCG stimulates the testicles or ovaries. Clomid helps stimulate the pituitary gland. Scally later added tamoxifen to his protocol to further help prevent shut down of the pituitary function. Scally typically started the hCG, Clomid, and tamoxifen all at the same time, but only prescribed the hCG for fifteen days, and at that point measured the testosterone to see whether he could continue treatment without the hCG. He then typically would continue the Clomid and tamoxifen for about another fifteen days (for a total of about thirty days).

11

Scally eventually added anabolic steroids to his HPTA treatment protocol and began alternating a period of treatment with the anabolic steroids for approximately twelve weeks with another round of the hCG, Clomid, and tamoxifen treatment for thirty days. Scally testified that he began adding anabolic steroids as part of his treatment protocol to help patients whose blood tests reflected a normal value for testosterone after the first round of hCG, Clomid, and tamoxifen, but the value was at the low end of the normal range for their age, and they were still experiencing hypogonadism symptoms.

Scally asserted that adding a round of anabolic steroids after stopping the other drugs is the best way to make the hCG, Clomid, and tamoxifen work better because "the best way to produce androgen receptor sites is androgens [i.e., anabolic steroids]." Scally maintained that stimulating these androgen receptor sites would work faster than continuing the Clomid alone. Scally acknowledged that the anabolic steroids would shut down the patient's HPTA (and thus possibly worsen the hypogonadism he was supposed to be treating), but he knew he would be able to successfully restart the HPTA loop because he had done so with the initial dose of hCG, Clomid, and tamoxifen. Nevertheless, Scally was prescribing steroids to patients with a prior history of illicit steroid use in a purported effort to help those patients quit taking illicit steroids.[12]

_____

[12] Typically Scally would give his patients 400 to 600 milligrams of anabolic steroids per week, including testosterone and other pharmaceutical steroids such as Winstrol, Anadrol-50, oxandrolone, and Halotestin. While patients were taking the steroids, he would prescribe other drugs to help prevent some of the anabolic steroids' side effects, including hair loss in men and masculinization in women.

**Preservation of error**

Before addressing Scally's points of error, we must first consider the threshold issue of whether Scally preserved any of these issues for appeal. Scally was required under the APA to file a motion for rehearing of the Board's final order before seeking judicial review. *See* Tex. Gov't Code Ann. § 2001.145 (West 2008). The Board argues that Scally's motion for rehearing filed with the Board was not sufficiently definite and thus failed to preserve error for appeal. Scally asserts that his motion for rehearing was sufficiently definite to preserve error.

The motion for rehearing is a statutory prerequisite to an appeal in a contested case, *see id.*, and must be sufficiently definite to notify the agency of the error claimed so that the agency can either correct or prepare to defend the error. *Suburban Util. Corp. v. Public Util. Comm'n of Tex.*, 652 S.W.2d 358, 365 (Tex. 1983). For each contention of error, the motion must set forth (1) the fact finding, legal conclusion, or ruling complained of and (2) the legal basis of that complaint. *See Hamamcy v. Texas State Bd. of Med. Exam'rs*, 900 S.W.2d 423, 425 (Tex. App.—Austin 1995, writ denied) (citing *Burke v. Central Educ. Agency*, 725 S.W.2d 393, 397 (Tex. App.—Austin 1987, writ ref'd n.r.e.)). It is not sufficient to set forth these two elements in generalities, for example, by stating that the findings of fact as a body are "not supported by substantial evidence." *Burke*, 725 S.W.2d at 397. While both elements must be present in the motion, neither requires a briefing of the law or facts. *Id.* The standard is one of fair notice. *See id.*

In the instant case, after Scally timely filed a motion for rehearing, the Board challenged the sufficiency of his motion, contending that it lacked sufficient detail to preserve the alleged errors. The Board contends that Scally has failed to preserve error as to any conclusion of

law or any finding of fact. Scally's motion for rehearing sets forth fourteen "issues presented for rehearing." Although he does not identify by specific number any conclusions of law as error, he specifically identifies 235 of the Board's 271 findings of fact in connection with his fourteenth issue, which complains that the cited findings of fact and the Board's conclusions are not supported by the evidence in the record or are based on unreliable evidence. Scally further provides detailed reasons for his objections to the complained-of findings of fact. This pleading was sufficient to preserve error on the issue of whether substantial evidence supports those findings of fact. Within the motion's first thirteen issues, Scally provided the Board with fair notice of the other issues he has raised on appeal, including the admissibility of the Board's expert testimony, the Board's findings and conclusions regarding the applicable standard of care, the Board's conclusions that the anabolic steroids were not prescribed for a valid medical purpose or for therapeutic purposes, the Board's conclusion that Scally failed to keep adequate medical records, and the Board's findings that Scally did not record a diagnosis for some patients.

Although the better practice would be to identify each complained-of finding and conclusion by number and to accompany each identified numbered error with the legal basis for the challenge, Scally's motion provided the Board with much more specific information than that found inadequate in cases finding waiver. *See, e.g.*, *Texas Alcoholic Bev. Comm'n v. Quintana*, 225 S.W.3d 200, 204 (Tex. App.—El Paso 2005, pet. denied) (finding waiver); *Hamamcy*, 900 S.W.2d at 425 (same); *Burke*, 725 S.W.2d at 398-99 (same); *see also Morgan v. Employees' Ret. Sys. of Tex.*, 872 S.W.2d 819, 822 (Tex. App.—Austin 1994, no writ) (party's "motion for rehearing is not a form-book example of such a motion, but it achieves its purpose" of sufficiently informing

agency of alleged errors). We find that Scally has sufficiently preserved error in his motion for rehearing, and thus, we will consider the arguments Scally has presented in his appellate brief.[13]

**Due process and equal protection**

In his first issue, Scally argues that the judicial-review process applicable to physician disciplinary actions violated his constitutional rights to due process and equal protection. *See* U.S. Const. amend. XIV. This argument is primarily based on the legislature's different procedural treatment of physicians and attorneys subject to disciplinary actions. Among Scally's various assertions, he attacks the application of the substantial-evidence standard of review to physician-license revocations and the lack of a jury trial de novo in the district court after a physician's license is revoked.

We review claims regarding deprivation of constitutional rights de novo because they present questions of law. *Granek*, 172 S.W.3d at 771-72. We begin with the presumption that the APA is constitutional and that the legislature has acted neither unreasonably nor arbitrarily. *See Pretzer v. Motor Vehicle Bd.*, 125 S.W.3d 23, 39 (Tex. App.—Austin 2003), *aff'd in part and rev'd in part on other grounds*, 138 S.W.3d 908 (Tex. 2004). The constitutional provision that Scally contends has been violated, the Fourteenth Amendment, provides in relevant part, that "[n]o State

---

[13] In his sixth issue, Scally asserts that his pleading in the district court, which alleged that he had complied with all conditions precedent before filing suit and was not denied by the Board, precludes the Board from arguing that Scally's motion for rehearing was insufficient to preserve error. Because we find that Scally's motion for rehearing was sufficiently detailed, we need not address this argument. *See* Tex. R. App. P. 47.1 (court of appeals must hand down opinions that are as brief as possible while addressing those issues necessary to final disposition of appeal).

shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

The procedural due-process safeguards of the federal and Texas constitutions protect litigants in agency proceedings when the agency "'deprives an individual of life, liberty, or property based on resolution of contested factual issues concerning that individual.'" *Flores v. Employees Ret. Sys. of Tex.*, 74 S.W.3d 532, 539 (Tex. App.—Austin 2002, pet. denied) (quoting 2 Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.2 at 3 (3d ed. 1994)) (internal quotation marks omitted). When analyzing Scally's due-process claim, we must determine whether he has a constitutionally protected liberty or property interest at stake, and if so, what process is due to sufficiently protect that interest. *See University of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995). Liberty or property interests protected under the Due Process Clause "attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law . . . ." *Paul v. Davis*, 424 U.S. 693, 710-11 (1976). A professional license is a property right, but it is one that has been created by statute and is subject to the state's power to impose conditions upon the granting or revocation of the license for the protection of society.[14] *See Adams v. Texas State Bd. of Chiropractic Exam'rs*, 744 S.W.2d 648, 652-53 (Tex. App.—Austin 1988, no writ) (citing *Sherman v. State Bd. of Dental Exam'rs*, 116 S.W.2d 843, 846 (Tex. Civ. App.—San Antonio 1938, writ ref'd)); *see also Dent v. State of W. Va.*, 129 U.S. 114, 121-22 (1889) (professional license is property interest but one subject to state regulation). Accordingly, we find

---

[14] The legislature has found that "the practice of medicine is a privilege and not a natural right of individuals and as a matter of public policy it is necessary to protect the public interest through enactment of this subtitle to regulate the granting of that privilege and its subsequent use and control . . . ." Tex. Occ. Code Ann. § 151.003 (West 2004).

16

that Scally does have a constitutionally protected property interest at stake that must be afforded procedural due process.

We now consider what process is due to protect Scally's property interest. At a minimum, due process requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Than*, 901 S.W.2d at 930. We disagree with Scally's assertion that he is entitled to some higher level of due process because the contested-case hearing was a quasi-criminal proceeding.[15] This Court has held that disciplinary action by the Board is not a quasi-criminal proceeding; it is civil. *Chalifoux v. Texas State Bd. of Med. Exam'rs*, No. 03-05-00320-CV, 2006 WL 3196461, at *12 (Tex. App.—Austin Nov. 1, 2006, pet. denied) (mem. op.) (addressing specificity of notice provided in Board complaint) (citing *Granek*, 172 S.W.3d at 773, 777 (addressing due-process implications of pre-prosecution delays in agency actions and applicable burden of proof)).

---

[15] Scally complains that the burden of proof for attorney disbarment is preponderance of the evidence, which he asserts is a higher standard than the substantial-evidence standard. To the extent Scally may be arguing that the Board should have been held to a higher burden of proof during the SOAH proceeding, we note that he has confused the burden of proof applicable to the Board during the license-revocation proceeding with the standard of review applied to the Board's final order. We have previously observed that "in civil cases '[n]o doctrine is more firmly established than that issues of fact are resolved by a preponderance of the evidence.'" *Granek v. Texas State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 777 (Tex. App.—Austin 2005, no pet.) (quoting *Pretzer v. Motor Vehicle Bd.*, 125 S.W.3d 23, 38-39 (Tex. App.—Austin 2003), *aff'd in part and rev'd in part on other grounds*, 138 S.W.3d 908 (Tex. 2004)). And we have rejected the contention that due process requires a higher burden of proof (i.e., the clear-and-convincing standard) in license-revocation proceedings, even when the proceeding involved an allegation of conduct constituting a criminal offense. *See Sanchez v. Texas State Bd. of Med. Exam'rs*, 229 S.W.3d 498, 509 (Tex. App.—Austin 2007, no pet.). We conclude that the ALJ held the Board to the appropriate burden of proof in Scally's license-revocation proceeding.

17

The legislature has provided that the default for appeal from a contested-case decision governed by the APA is substantial-evidence review on the agency record and that the right to a trial de novo in an administrative appeal must be specifically stated in the applicable statute. *See* Tex. Gov't Code Ann. § 2001.174. As the Board points out, the legislature has the constitutional power to limit the review of the Board's disciplinary action against physicians to a substantial-evidence review. *See Martinez v. Texas State Bd. of Med. Exam'rs*, 476 S.W.2d 400, 404-05 (Tex. Civ. App.—San Antonio 1972, writ ref'd n.r.e.) (citing Tex. Const. art. II, § 1, art. XVI, § 31). In addition, physician disciplinary actions do not require trial by jury. *Id.* at 405 (citing *City of Houston v. Blackbird*, 394 S.W.2d 159, 162-63 (Tex. 1965)); *see also Adams*, 744 S.W.2d at 651-54 (finding existing laws when Texas Constitution was adopted in 1876 did not provide for jury trial of physician's license revocation). The legislature has constitutionally provided for a non-jury trial because "a jury trial . . . would be incompatible with the concept of agency adjudication and [would] interfere substantially with the Board's role in the statutory scheme" enacted by the legislature for the protection of the public health, safety, and welfare. *Adams*, 744 S.W.2d at 653-54 (holding that article V, section 10 of Texas Constitution does not require jury trial if legislature has determined jury trial would be unsuitable in particular proceedings). The record reflects that Scally received notice of the Board's complaint, as well as a full opportunity to present his case to the ALJ, who, by statute, is a neutral administrative magistrate. *See* Tex. Gov't Code Ann. § 2001.058(a)-(d) (West 2008), § 2003.021(a) (West 2008); *Pierce v. Texas Racing Comm'n*, 212 S.W.3d 745, 755 (Tex. App.—Austin 2006, pet. denied). Thus, the required elements of due process—notice, hearing, and an impartial factfinder—were satisfied at Scally's contested-case hearing. *See Martinez*, 476 S.W.2d at 405.

We turn next to Scally's contention that the judicial-review process violated his right to equal protection by making "unreasoned distinctions" between attorney-license revocations and physician-license revocations.[16] We conduct a multi-tiered analysis of whether a particular classification violates the Fourteenth Amendment. *See Richards v. League of United Latin Amer. Citizens (LULAC)*, 868 S.W.2d 306, 310-11 (Tex. 1993). The constitutional guarantee of equal protection requires only that disparate treatment of different classifications be rationally related to a legitimate state purpose, unless the classification impinges on the exercise of a fundamental right or distinguishes between people on a "suspect" basis, such as race or national origin.[17] *Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 631-32 (Tex. 1996) (noting that Texas courts apply rational-basis test when analyzing constitutionality of regulations affecting economic rights); *see also Semler v. Oregon State Bd. of Dental Exam'rs*, 294 U.S. 608, 610-11 (1935) (holding state was not bound to regulate all professional classes in same way). Maintaining a medical license is not a fundamental right, and physicians are not a suspect

---

[16] Scally relies on a number of cases in support of the proposition that these "unreasoned distinctions [between attorneys and physicians] . . . impede open and equal access to the courts," but these cases are inapposite here. They all involve equal access to the right to an appeal of a criminal conviction, once the right to an appeal has been provided. *See, e.g.*, *Chaffin v. Stynchcombe*, 412 U.S. 17, 24 n.11 (1973).

[17] Classifications that impinge upon the exercise of a fundamental right or distinguish between people on a suspect basis (i.e., race, national origin, and alienage) "are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *see also* Tex. Const. art. I, § 3a (recognizing "sex, race, color, creed, [and] national origin" as protected classes). In a few limited situations, none of which are applicable here, courts review classification under an intermediate level of review to determine whether the classification is "substantially related to a sufficiently important governmental interest." *City of Cleburne*, 473 U.S. at 440-41 (substantial-relationship test applied primarily in cases involving classifications based on gender and illegitimacy).

class.[18] Consequently, we must determine whether the legislature had a rational basis for differentiating between attorney-license revocations and physician-license revocations. "In so doing, we must uphold the law if we can conceive of any rational basis for the Legislature's action." *Owens Corning v. Carter*, 997 S.W.2d 560, 581 (Tex. 1999).

The legislature has granted the Board the power to protect the public interest by regulating those physicians who are granted the privilege of practicing medicine. Tex. Occ. Code Ann. § 151.003. The legislature has also provided that the Board's decision to revoke a physician's license is subject to the substantial-evidence standard of review.[19] *See* Tex. Gov't Code Ann. § 2001.174. The lack of a trial de novo (either a bench or jury trial) for license-revocation appeals by physicians is rationally related to the legitimate governmental purpose of conservation of judicial resources. *See Pretzer*, 125 S.W.3d at 39-40. In addition to conserving judicial resources, the lack

---

[18] Fundamental rights are rights that are "deeply rooted in this Nation's history and tradition" and are "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citations and internal quotation marks omitted). Scally cites no authority, and we have found none, to support the proposition that the right to retain his medical license is a "fundamental right" that implicates strict scrutiny. *See Adams v. Texas State Bd. of Chiropractic Exam'rs*, 744 S.W.2d 648, 652-53 (Tex. App.—Austin 1988, no writ) (license to practice one's profession is property right subject to revocation).

[19] We note that the attorney-grievance process differs procedurally from the physician-disciplinary process because attorneys may elect to have a complaint against them heard in a district court or by an evidentiary panel of the district grievance committee. *See* Tex. Disciplinary R. Prof'l Conduct 2.15, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G app. A (West 2005). Thus, although Scally states that attorneys are entitled to a trial de novo in the district court without losing their right to practice, a disbarment proceeding that the attorney has elected to have heard in the district court is actually the procedural equivalent of the physician's contested-case hearing. The applicable standard of review on appeal depends upon which election is made by the attorney. While a final judgment of the district court may be appealed as in civil cases generally, *id.* R. 3.16, an appeal of an evidentiary panel's judgment is to the Board of Disciplinary Appeals and subject to the substantial-evidence standard of review, *id.* R. 2.24.

of a jury trial is rationally related to the legislature's legitimate governmental decision that the adjudicatory function in license-revocation proceedings should be delegated to the Board, so that it "will exercise its expert knowledge, experience, and special facilities in finding facts, applying law, and formulating and applying administrative policy to accomplish the particular objectives set for the agency by the Legislature," including the protection of the public's health, safety, and welfare. *Adams*, 744 S.W.2d at 653.

We also find that the Board's decision that a person may not practice medicine while his license-revocation appeal is pending is rationally related to its mandate to protect the public interest in health and safety. *See* Tex. Occ. Code Ann. § 164.011(b). Moreover, an appealing license holder is entitled to seek a stay from the appropriate court to allow him to continue practicing, as long as the court finds that his continued practice does not present a danger to the public.[20] *See id.* § 164.011(b), (c). Accordingly, we conclude that the legislature's different treatment of physician-license revocations and attorney-license revocations does not violate equal protection. *See Barshop*, 925 S.W.2d at 631-32; *see also Pierce*, 212 S.W.3d at 757. We overrule Scally's first issue.

**Admission of expert testimony**

Scally contends in his second issue that it was an abuse of discretion to admit the testimony of the Board's two experts, Drs. Jackson and Werner, because neither one qualifies as an

---

[20] Contrary to Scally's assertion, attorneys who have lost their licenses are subject to a more stringent penalty than physicians because neither a district court judgment of disbarment nor an evidentiary panel's order of disbarment can be superseded or stayed during the pendency of any appeals. *See* Tex. Disciplinary R. Prof'l Conduct 2.25, 3.14. Only *license suspensions* may be stayed pending appeal upon petition to the district court or the evidentiary panel, if the attorney proves that continued practice does not pose a continuing threat to the welfare of the attorney's clients or the public. *See id.*

21

expert under Texas Rule of Evidence 702, and thus, their opinions were neither relevant nor reliable. The Board argues that the ALJ did not err by admitting the doctors' testimony because both doctors are more than adequately qualified and their testimony about the standard of care and other issues is both relevant and reliable.

We review rulings on the admission or exclusion of evidence at the administrative level under the abuse-of-discretion standard applied to trial courts. *City of Amarillo v. Railroad Comm'n of Tex.*, 894 S.W.2d 491, 495 (Tex. App.—Austin 1995, writ denied). A court abuses its discretion if it acts without reference to guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). An ALJ, like a trial court, has broad discretion when deciding whether to admit expert testimony in a contested-case hearing, and we will not disturb that decision on appeal in the absence of an abuse of discretion. *See Fay-Ray Corp. v. Texas Alcoholic Bev. Comm'n*, 959 S.W.2d 362, 367 (Tex. App.—Austin 1998, no pet.).

A two-part test governs the admissibility of expert testimony: (1) the expert must be qualified; and (2) the testimony must be relevant and based on a reliable foundation. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). When deciding whether an expert is qualified, the trial court must insure that the proposed expert "'truly ha[s] expertise concerning the actual subject about which [he is] offering an opinion.'" *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 719 (Tex. 1998) (quoting *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996)). The Texas Supreme Court has explained that when assessing reliability, the trial court must "evaluate the methods, analysis, and principles relied upon in reaching the opinion. . . . [and] should ensure that the opinion comports with applicable professional standards outside the courtroom and that it will have a reliable basis in the knowledge and experience of the discipline."

22

*Id.* at 725-26 (internal quotation marks omitted). In *Robinson*, the court identified six nonexclusive factors that courts may consider when determining whether an expert's scientific testimony is reliable and thus admissible, but noted that courts may consider other factors and that those factors which a court will find helpful will differ with each particular case.[21] 923 S.W.2d at 557. If expert opinion testimony will help the factfinder understand the evidence or determine a fact at issue, it should be admitted. Tex. R. Evid. 702; *Fay-Ray Corp.*, 959 S.W.2d at 367.

Drs. Jackson and Werner are both board certified in endocrinology, which is a medical specialty concentrating on the endocrine system, the hormones produced by the endocrine glands, and related diseases, and which includes the function of the HPTA. Dr. Jackson testified that he had been board certified in endocrinology for nearly twenty years and internal medicine for over twenty years, an associate professor of internal medicine with Texas A&M College of Medicine Health Sciences Center for approximately fifteen years, and a staff endocrinologist at Scott and White Clinic and Memorial Hospital, a teaching hospital, for nearly twenty years. Dr. Werner testified that he had been board certified in endocrinology and internal medicine for over twenty years, a professor of medicine at Texas Tech University teaching endocrinology and internal medicine for ten years, and that he continued to see patients in his role as a professor. Both doctors

---

[21] The six nonexclusive factors identified in *Robinson* are: "(1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique." *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995) (citation omitted).

testified that as part of their medical practice they had medically managed patients with low testosterone levels and testosterone deficiency.

The record demonstrates that the ALJ allowed Drs. Jackson and Werner to offer their expert testimony after voir dire on the issue of their qualifications. Throughout the proceedings, the ALJ actively participated by asking clarifying questions of the witnesses when necessary, which allowed her to further assess the witnesses' expertise and the principles they relied upon in reaching their opinions. *See Olin Corp. v. Smith*, 990 S.W.2d 789, 796-97 & n.1 (Tex. App.—Austin 1999, pet. denied) (finding that "the confluence of the 'gatekeeper' and fact-finder functions" in bench trial "served to ventilate fully any *Robinson* issues"); *Fay-Ray Corp.*, 959 S.W.2d at 367 (noting ALJ herself questioned expert about his training and experience). As this Court observed in *Olin*, when the trial court serves as factfinder, in addition to being the gatekeeper of expert testimony as described in *Robinson* and *Gammill*, our concerns about the potentially prejudicial impact of expert testimony are reduced. 990 S.W.2d at 796 n.1. Here, as in *Olin*, the ALJ heard extensive testimony about the experts' qualifications as well as their methods, analyses, and the principles upon which they relied in reaching their opinions. *See id.* at 796. The ALJ's dual role in this proceeding allowed her not only to make a preliminary assessment about the qualifications of the Board's experts and the reliability and relevance of their opinions, but also to continue exploring throughout the hearing whether their testimony would assist her as factfinder in understanding the evidence and determining the facts at issue. *See id.* at 796-97.

Nevertheless, Scally argues that Drs. Jackson and Werner are not qualified to provide expert testimony because they lack "knowledge, skill, experience, training, or education" on (1) anabolic steroids, (2) measurement of serum testosterone, (3) the medical risks of anabolic

24

steroids, (4) hypogonadism, (5) the use of magnetic resonance imaging in diagnosing hypogonadism, (6) anabolic-steroid-induced hypogonadism, and (7) tamoxifen's and the aromatization inhibitors' effect on the HPTA. *See* Tex. R. Evid. 702. Contrary to Scally's argument, all of these issues are encompassed within Drs. Jackson and Werner's area of expertise—endocrinology. Both doctors testified that they formed their opinions in this case based on their review and analysis of Scally's treatment records for the patients at issue, among other documents. And as mentioned, the ALJ asked clarifying questions and probed the principles upon which they relied in forming their opinions. Although Scally frames this argument in terms of the experts' qualifications, the substance of his complaints on these subissues amounts to an attack on the experts' credibility and the weight to be afforded their testimony. His disagreement with the Board's experts' testimony on specific medical issues does not render them unqualified to present those opinions. Likewise, his disagreement with their conclusions does not render the methods, analyses, and principles they relied upon in reaching their opinions unreliable. In a substantial-evidence review, we resolve evidentiary ambiguities in favor of the administrative order, and we cannot substitute our judgment for the ALJ's regarding the weight and credibility of the evidence presented. We overrule Scally's second issue because we find no abuse of discretion in the ALJ's decision that Drs. Jackson and Werner were qualified as experts and their testimony should be admitted.

**Substantial evidence**

In his third issue, Scally contends that substantial evidence does not support the findings of fact underlying the Board's order revoking his license.[22] He asserts that the findings of

_____

[22] Scally also argues that because the Board's two experts are not qualified, their testimony was neither reliable nor relevant, and thus, provided no support for the order. We have disposed of

25

fact are contradictory and irreconcilable with "sound medical principles, properly admitted judicial admissions, and other [findings of fact]."

We must uphold the Board's order "if (1) the findings of underlying fact in the order fairly support the [Board's] findings of ultimate fact and conclusions of law, and (2) the evidence presented at the hearing reasonably supports the findings of underlying fact." *Texas Water Comm'n v. Lakeshore Util. Co.*, 877 S.W.2d 814, 818 (Tex. App.—Austin 1994, writ denied). Resolving factual conflicts and ambiguities is the agency's function, and the purpose of substantial-evidence review is to protect that function. *Brinkmeyer*, 662 S.W.2d at 956. In this case, the Board's findings of ultimate fact and conclusions of law challenged by Scally on substantial-evidence grounds concern the issue of whether Scally prescribed anabolic steroids to patients in violation of the standard of care without a valid medical purpose.

The ultimate conclusions which support the Board's decision to revoke Scally's license based on his prescribing anabolic steroids to the eight patients at issue include conclusions of law fifteen, eighteen, and nineteen, which state that Scally "violated the medical standards of care by prescribing anabolic steroids without a valid medical reason," "administered anabolic steroids to [the eight patients] for non-therapeutic reasons in violation of the [Medical Practice Act]," and "administered Schedule III anabolic steroids to [the eight patients] for purposes of bodybuilding in violation of the Texas Health and Safety Code, thereby violating the [Medical Practice Act]." *See* Tex. Occ. Code Ann. §§ 164.051(a)(1), .052(a)(5), .053(a)(1), (5); Tex. Health & Safety Code Ann. § 481.071.

_____

that argument with our conclusion that the ALJ's decision to admit the experts' testimony was not an abuse of discretion.

Scally challenges numerous fact findings, but the heart of his argument is that the evidence does not support the factual findings underlying the Board's ultimate conclusions because the eight patients for whom he prescribed anabolic steroids were hypogonadal. Thus, he contends he had a valid medical purpose and therapeutic reasons for prescribing the drugs to these patients, whom he asserts were not in good health. The Board, on the other hand, contends that substantial evidence supports the ALJ's conclusion that Scally breached the standard of care because Scally prescribed anabolic steroids: (1) to healthy individuals (patients whose testosterone levels had returned to normal after possibly being hypogonadal because of prior use of illicit steroids for non-therapeutic reasons); (2) for the purpose of bodybuilding; including (3) to a patient, J.Bi., who exhibited signs of steroid abuse; and (4) to a patient, S.L., who was at an increased risk for prostate cancer.

For purposes of our discussion, we will group the findings of fact that Scally contends are not supported by substantial evidence into two topics: the applicable standard of care and whether Scally prescribed anabolic steroids for bodybuilding. The ALJ's ultimate conclusions about Scally's improper prescription of anabolic steroids depend upon her resolution of these issues. To the extent that Scally argues that other inconsistencies and contradictions can be found within the Board's experts' testimony and the final order itself, we again note that our concern is only the overarching question of whether substantial evidence existed to support the ALJ's ultimate conclusions. *See Lakeshore Util. Co.*, 877 S.W.2d at 818. The ALJ, as judge of the weight to be accorded to witnesses' testimony, may rely upon part of the testimony of one witness and disregard the remainder. *See Southern Union Gas Co. v. Railroad Comm'n of Tex.*, 692 S.W.2d 137, 141-42 (Tex. App.—Austin 1985, writ ref'd n.r.e.).

27

*Evidence of standard of care*

The Board's experts testified about the standard of care for treating patients who want to stop taking anabolic steroids and those who have steroid-induced hypogonadism. Both Drs. Werner and Jackson testified that the appropriate procedure is to have the patient stop using all anabolic steroids and wait to see whether the patient's system will return to its natural equilibrium on its own, while watching for what they termed "withdrawal symptoms," i.e., hypogonadism symptoms, which are addressed if the patient develops them. Both doctors agreed that if withdrawal symptoms developed and the patient had a persistent problem with the production of testosterone, they would treat the symptoms by placing the patient on a replacement dose of testosterone for several months and then slowly decreasing the amount to let the patient's system return to normal. The replacement dose is a physiological dose comparable to what the body normally makes, as opposed to a pharmacological dose, which would be a higher dose than the body normally makes. Dr. Werner further explained that he would engage in "watchful waiting" if the patient had been on steroids for only a short time, but that if the patient had been on high doses for a long time and his whole HPTA was suppressed, he would keep him on the replacement dose of testosterone for approximately two to four months and then slowly decrease the dose.

Dr. Werner testified that there would be no valid medical purpose for placing a patient who had been taking black-market steroids on a prescriptive anabolic steroid. He also opined that it is outside the standard of care to treat mental health problems, such as depression, with anabolic steroids, as Scally's expert, Dr. DiPasquale, testified that Scally was doing.[23] Based on his review

---

[23] Dr. DiPasquale acknowledged that treating HPTA dysfunction with anabolic steroids is not a generally accepted practice in the medical community, but he opined that it is proper to use

28

of the patients' records, Dr. Werner concluded that Scally was prescribing anabolic steroids to the patients in this case for bodybuilding purposes, which is outside the standard of care and not a legitimate medical purpose. Dr. Jackson likewise testified that it violates the standard of care to place a patient who has been using black-market steroids on prescriptive anabolic steroids. As he explained, "[a]ny additional androgenic agent is going to continue suppression of the [HPT] axis . . . . [R]esuming high dose androgen or anabolic steroid therapy when you're trying to get the axis to recover makes no sense."

Both Drs. Werner and Jackson testified that there are a number of medical dangers associated with the use of the anabolic steroids (i.e., Anadrol-50, oxandrolone, Winstrol, Halotestin) that Scally prescribed to his patients. Dr. Jackson testified that he will not use them to treat testosterone deficiency because of the liver side effects (liver damage, jaundice, and elevations of liver enzymes), among others, including cholesterol effects related to arteriosclerosis and heart disease, enlargement of the prostate, and possible stimulation of prostate and other cancers. Dr. Werner testified that these are only the known, measurable side effects, but as steroid use is further studied, there are likely to be more long-term problems discovered that are associated with their use. Both Board experts testified that because of these dangers, they would only use replacement doses of testosterone agents not associated with these side effects to treat patients trying to stop using anabolic steroids who were experiencing sufficient testosterone-deficiency symptoms. Similarly,

---

anabolic steroids to treat the "psychological physiological" concerns of men and women who have used illicit steroids. He also confirmed, however, that the medical records of the patients at issue do not document those sorts of problems. Dr. DiPasquale testified that he has never prescribed anabolic steroids as part of his own practice. Dr. DiPasquale agreed with the other three doctors that giving a patient testosterone or other anabolic steroids will increase the testosterone level and depress the HPTA.

29

Dr. DiPasquale testified that prescribing anabolic steroids is not the appropriate method for normalizing a patient's testosterone level.

Dr. Jackson testified that the normal dose of testosterone for replacement therapy is 100 milligrams per week, 200 milligrams every two weeks, or 300 milligrams every three weeks (depending on the form). He explained that the dosage Scally prescribed to these patients of 200 milligrams per week is twice as much as the normal replacement dose.[24] In addition, Scally would prescribe other anabolic steroids, like Anadrol, oxandrolone, and sometimes Winstrol, at the same time as he was prescribing twice the normal replacement dose of testosterone. Dr. Jackson explained the similarity between this practice and "stacking," a practice in which bodybuilders use multiple different anabolic steroids in pharmacological doses at the same time to increase the drugs' anabolic effects. Dr. Jackson testified that there is no justification for Scally's practice of adding other anabolic agents to the testosterone dose. He explained that the anabolic steroids would further suppress the axis, leading Scally to prescribe another course of his hCG-Clomid-tamoxifen protocol "to wake up the system." Jackson observed that Scally's justification noted in the records for this repeating "yo-yo" cycle of the hCG-Clomid-tamoxifen protocol followed by a round of anabolic steroids was to "increase lean body mass" (nonfat mass, including muscle, water, bone, connective tissue, and internal organs), which Jackson viewed as a catch phrase for increasing muscle enhancement.

---

[24] The dose Scally prescribed is a lower dose than what is often used in competitive bodybuilding, although no studies demonstrate exactly what dose is needed to build muscle.

30

### *Scally's challenge to standard-of-care evidence*

Scally contends that the findings of fact related to the standard of care applicable to the patients at issue are not supported by substantial evidence.[25] As discussed above, both Board experts provided their opinions that the appropriate standard of care for patients with steroid-induced hypogonadism or a dysfunctional HPTA who want to stop anabolic steroids involves watchful waiting, and if necessary, testosterone replacement in physiological doses.[26] Scally insists that because the Board's experts did not provide citation to peer-reviewed literature for this standard, the ALJ should not have relied on this testimony because it was based only on the experts' unsupported opinions. *See Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997). While Scally is correct that "an expert's bald assurance of validity is not enough," *id.*, more than that was

---

[25] Scally also argues that the proposal for decision states that the Board "failed to articulate the standard of care in diagnosing the patients," and thus it is not possible to articulate a standard of care for treatment. Contrary to Scally's assertion, the ALJ found that the Board did not establish that Scally had conducted inappropriate testing, not that it failed to articulate the standard of care for diagnosis of hypogonadism or secondary hypogonadism. Scally's actual contention appears to be that the Board failed to establish when it is medically appropriate to treat a patient for hypogonadism or secondary hypogonadism, and thus, that it is not possible for the Board to have determined that Scally inappropriately treated his patients for these conditions. But as part of the Board's experts' testimony regarding the standard of care for steroid-induced hypogonadism, they explained that the appropriate course of action is to monitor the patient who has stopped using anabolic steroids for both testosterone deficiency and development of associated symptoms for some time before prescribing any drugs, so that the HPTA has a chance to return to normal on its own. They also testified that it is never appropriate to treat steroid-induced hypogonadism by prescribing anabolic steroids other than replacement doses of testosterone.

[26] J.Bi., the only woman patient at issue, was taking veterinary-grade Winstrol when she had her initial appointment with Scally. She was exhibiting symptoms of masculinization including facial hair growth, an enlarged clitoris, cessation of menstrual periods, and a deepening of her voice. Scally recorded a rule-out diagnosis of perimenopause for her. Although Scally had her discontinue the use of veterinary-grade Winstrol, he prescribed human-grade Winstrol. Scally later prescribed her oxandrolone, too. The Board's experts testified that it was outside the standard of care to prescribe Winstrol and other anabolic steroids to a female patient experiencing masculinization.

31

provided by the Board's experts here. The experts provided the underlying scientific rationale for the standard of care, explaining the medical risks associated with the anabolic steroids that Scally was prescribing and the medical reasons why those drugs are not typically prescribed to someone who is attempting to stop taking them. They also explained the medical reasons for prescribing the most minimal dose of testosterone possible, if replacement testosterone is warranted by a patient's complaints. In addition, although Scally insists—without citation to authority—that peer-reviewed publication is necessary to establish the Board's standard of care, his own treatment protocol has not been subjected to peer review before publication. Scally also asserts that the Board's experts developed this theory solely for this litigation, but that assertion is contrary to the experts' testimony that this is the methodology they use when treating patients and teaching medical students. For all these reasons, we conclude that substantial evidence supports the ALJ's factual findings related to the standard of care.

### *Evidence of prescription of anabolic steroids to healthy patients for bodybuilding*

The ALJ provided a detailed analysis of each patient's treatment in the proposal for decision, based on the medical records and the expert testimony. As part of her analysis, the ALJ considered the reason each patient was seeking treatment, whether Scally was providing another source of anabolic steroids to patients who were already known to have used illicit steroids, and what condition Scally treated. We will summarize the facts most pertinent to the Board's ultimate conclusion that Scally prescribed anabolic steroids to healthy patients for bodybuilding.

All nine of the patients indicated an interest in Scally's BodyBuilding program when they came in for their initial visit. All eight to whom Scally prescribed anabolic steroids were either

currently using anabolic steroids when they came in for their initial or a subsequent visit or they had a history of prior steroid use.[27]  Nothing in their medical records indicates they sought help with stopping steroid use.  Nothing in their medical records indicates that Scally counseled those patients using illicit steroids to stop.

As Scally explained in his expert report, hypogonadism may manifest through a number of different symptoms, including among others, erectile dysfunction, loss of libido, depression, decreased appetite, decreased cognitive abilities, sleep disturbances, mood disturbances, fatigue, and decreased muscle mass and strength.  T.C., M.W., J.S., J.B., and J.Bi. reported none of these symptoms at their initial appointments.[28]  J.M. reported irritability and difficulty staying asleep, T.W. reported some hypogonadism symptoms (poor libido and sex drive, sleep disturbances, mood disturbances), and S.L. reported only "fair" libido and sex drive and occasional erectile problems.  Scally noted that S.D. had decreased testicular size at his initial appointment.

Significantly, most of the patients were never diagnosed with hypogonadism.  For M.W., J.S., and T.W., Scally issued only rule-out diagnoses of hypogonadism and/or secondary hypogonadism and did not issue definitive diagnoses after testing.  For J.B., Scally did not indicate that he suspected secondary hypogonadism; instead, his goals were to increase J.B.'s lean body mass and libido.  For J.Bi., the only woman patient at issue, Scally indicated a rule-out diagnosis of perimenopause.  For S.D., Scally originally issued a definitive diagnosis of gynecomastia

---

[27]  T.C. was the only patient for whom Scally did not prescribe steroids.  It appears from the record that T.C. never returned after his initial visit.

[28]  Although the medical records do not reflect symptoms reported by these patients, the Board pled in its complaint that M.W. had libido problems and decreased testicle size, J.S. had low libido and energy, and J.B. had decreased libido and weight loss.

(abnormally enlarged breast tissue in a male, which can be a side effect of steroid use), for which he prescribed tamoxifen.[29] For J.M. and S.L., Scally issued definitive diagnoses of hypogonadism.[30]

Finally, one of the most compelling pieces of evidence is the fact that Scally prescribed anabolic steroids to M.W., J.S., J.M., T.W., S.L., and S.D. after their testosterone levels had returned to within the normal range, as defined by the lab that performed the blood tests.[31] In some cases, Scally also prescribed anabolic steroids to patients when they had high levels of total testosterone.[32]

---

[29] S.D. was a bodybuilder who told Scally that he was involved in bodybuilding competitions and used illicit anabolic steroids. S.D. refused to quit taking steroids and was actively preparing for a bodybuilding competition when Scally prescribed the tamoxifen to reduce the gynecomastia, which is a side effect of steroid use. S.D.'s visits to Scally were intermittent, and three years later, when S.D. had a normal total testosterone level, Scally prescribed anabolic steroids to him.

[30] S.L. had a prior history of anabolic-steroid use and was being treated by another doctor, a urologist, for his elevated PSA level, which indicates a possibility of prostate cancer. He was already taking replacement testosterone prescribed by the urologist when he came in to see Scally and had a high level of total testosterone. Scally prescribed testosterone cypionate to continue S.L.'s replacement therapy, but also prescribed Winstrol and other anabolic steroids. Drs. Werner, Jackson, and DiPasquale all testified that prescribing anabolic steroids to S.L. exposed him to a greater risk of cancer growth.

[31] In addition, Scally prescribed testosterone and other anabolic steroids to J.B. over a period of several months while his total testosterone level was noted as "pending." Scally also prescribed anabolic steroids to J.Bi., a woman already showing signs of masculinization at her initial visit.

[32] For example, Scally continued prescribing testosterone cypionate to J.M. on at least two occasions when his total testosterone levels were high. On one occasion, he prescribed testosterone cypionate to J.M. before receiving the laboratory results, which later showed J.M.'s level to be high. Nothing in the medical records indicates he advised J.M. to stop the testosterone after receiving the laboratory results.

34

***Scally's challenge to bodybuilding evidence***

Scally asserts that the anabolic steroids he prescribed were proper medications for the conditions he diagnosed and that there is no reliable evidence that he prescribed them for the nontherapeutic purpose of bodybuilding. When we consider the record as a whole, there is substantial evidence in the record that supports the ultimate conclusions that Scally prescribed the anabolic steroids without a valid medical reason for the nontherapeutic purpose of bodybuilding. Scally's marketing materials show that he offered a program for bodybuilding, but not one for HPTA normalization or cessation of steroid use. The medical records reflect that all nine of the patients at issue indicated an interest in the BodyBuilding program, and none indicated they were there to stop taking anabolic steroids.

As part of his protocol, Scally prescribed anabolic steroids to patients after their testosterone levels came back within normal range, even though returning the testosterone level to normal was the purported goal of restarting the HPTA feedback loop.[33] In other words, Scally was prescribing anabolic steroids to otherwise healthy patients. He also typically prescribed testosterone at two times the normal replacement dose and at the same time as he prescribed other anabolic steroids. Scally admitted that "[r]einitiating androgens will only continue to suppress the [HPTA] and potentially worsen the condition for which they were stopped." In addition, all three of the other

---

[33] Scally contends that whether he prescribed the anabolic steroids for a valid medical reason should be controlled by a long list of factors that he derives from primarily federal case law. While we need not determine whether those factors are applicable here, we note that even if they are, one of the factors Scally cites is the lack of a logical relation between the drugs prescribed and the treatment of the alleged condition. *See, e.g.*, *United States v. Rogers*, 609 F.2d 834, 838-39 (5th Cir. 1980).

experts, including Scally's own, opined that Scally prescribed anabolic steroids for purposes of bodybuilding.[34]

We overrule Scally's third issue because we find that substantial evidence supports the findings of fact underlying the ultimate conclusions in the Board's order.

**Adequacy of medical records**

Scally asserts in his fourth and fifth issues that the Board erred by finding that Scally failed to maintain adequate medical records for T.C., M.W., J.S., T.W., J.B., and J.Bi. because Scally did not provide a "diagnosis" for these patients as required by rule 165.1(a). *See* 22 Tex. Admin. Code § 165.1(a) (1997) (Tex. Med. Bd., Med. Records).[35] Scally maintains that his medical records were sufficient because they included a "rule-out diagnosis" for each patient. A "rule-out diagnosis" is merely a possible diagnosis, not a definitive diagnosis. The Board does not agree that a "rule-out diagnosis" is a "diagnosis" under the rule. It interprets the term "diagnosis" to mean a definitive diagnosis that is justified by the patient's symptoms. Scally challenges this interpretation of the rule.

---

[34] Dr. DiPasquale agreed that Scally prescribed anabolic steroids to M.W., J.S., J.B., J.Bi., and S.L. for bodybuilding purposes. Scally contends that Dr. DiPasquale testified otherwise based on Dr. DiPasquale's testimony that Scally was prescribing the steroids not only to increase muscle mass and strength, but also to treat the "psychopathology" that Dr. DiPasquale described as a potential problem for Scally's patients. Dr. DiPasquale explained that "certain people psychologically or emotionally . . . feel better with bigger muscles." Dr. DiPasquale acknowledged, however, that the medical community at large would not find it acceptable to prescribe drugs or anabolic steroids for the purpose of making these people feel better. He also acknowledged that Scally did not document in the patients' medical records the existence of this type of problem. Instead, he based his testimony that this psychopathology was a factor in Scally's prescription of anabolic steroids on his discussions with Scally.

[35] Although the Board has amended the rule several times, all citations to rule 165.1(a) herein refer to the 1997 rule that was in effect at the time Scally treated the patients at issue.

36

Although Scally challenges the Board's findings and conclusions on statutory-construction grounds, we briefly summarize the evidence admitted at the hearing about the condition of Scally's medical records to provide context for our discussion of these issues.

### Evidence that Scally's recordkeeping was inadequate

As discussed above, Scally never actually diagnosed most of the patients with hypogonadism, and for several patients, Scally's records do not include a diagnosis even after he received lab results ordered on the basis of his rule-out diagnosis. Both Board experts testified that a rule-out diagnosis is not the same as a true diagnosis. Dr. Werner explained that it is merely a tentative diagnosis, also known as a differential diagnosis. In other words, a doctor makes a rule-out diagnosis based on the patient's symptoms and complaints and then tests to determine whether he can eliminate the rule-out diagnosis from his mental list of possible diagnoses. Both Board experts testified that it is below the standard of care to fail to provide a diagnosis. Dr. DiPasquale acknowledged that he had to confer with Scally about his treatment of each patient because the medical records were so incomplete and difficult to read.

The ALJ concluded that the records of M.W., J.S., T.W., J.B., and J.Bi. were inadequate because they lacked a diagnosis, and T.C.'s records were inadequate because the recorded symptoms did not support Scally's rule-out diagnoses or his treatment plan.

### Scally's challenge to the Board's findings that his records were inadequate

Scally contends that the Board impermissibly engaged in ad hoc rulemaking and acted in excess of its statutory authority and in violation of Scally's constitutional rights to due process and against enforcement of an ex post facto law by its interpretation of former rule 165.1(a). *See* 22 Tex.

37

Admin. Code § 165.1(a). We construe administrative rules in the same manner as statutes. *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999). Statutory construction is a matter of law, subject to de novo review. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008). When we construe administrative rules, "'[a]n administrative agency's interpretation of its own rules is entitled to great weight and deference; it controls unless plainly erroneous or inconsistent with the agency's enabling statute.'" *Cities of Dickinson v. Public Util. Comm'n of Tex.*, 284 S.W.3d 449, 452 (Tex. App.—Austin 2009, no pet.) (quoting *Ackerson v. Clarendon Nat'l Ins. Co.*, 168 S.W.3d 273, 275 (Tex. App.—Austin 2005, pet. denied)).

The version of rule 165.1(a) in effect for the contested-case hearing provided that Board-licensed physicians "shall maintain adequate medical records for each patient. For purposes of this section, 'adequate medical record' shall mean any records documenting or memorializing the history, diagnosis, and treatment of the patient." 22 Tex. Admin. Code § 165.1(a). In findings of fact 52-54, 62, 96, 97, 104, 178, 179, 200, and 217, the Board found that:

- medical records are inadequate without a diagnosis;

- a rule-out diagnosis is not a diagnosis, but only a possible diagnosis that the doctor wants to investigate to determine if the patient has that condition;

- many of Scally's records were illegible;

- the records of M.W., J.S., T.W., J.B., and J.Bi. were inadequate because they lacked a diagnosis; and

- T.C.'s records were inadequate because they contained an unsupported diagnosis.

Scally contends that the Board's interpretation of the rule to exclude rule-out diagnoses is impermissible ad hoc and ex post facto rulemaking. He further argues that this

38

interpretation is inconsistent with the federal Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. No. 104-191, 110 Stat. 1936 (codified primarily in Titles 18, 26, and 42 U.S.C.), which he alleges uses the term "diagnosis" to include rule-out diagnoses, and with Medicare diagnosis coding, which he alleges allows listing of a chief complaint, sign, or symptom as an alternative to a diagnosis. In his fourth and fifth issues, he argues that under these guidelines, the patients' medical records are adequate. As the Board points out, even if HIPAA and Medicare allow a rule-out diagnosis or a description of complaints instead of an actual diagnosis, the Board is entitled to require more of its licensees. The Board's rule is not contrary to HIPAA because a doctor who complies with the Board's rule will also be in compliance with HIPAA. *See* 45 C.F.R. § 160.202 (2010).

We must defer to the Board's interpretation unless it is plainly erroneous or inconsistent with the rule. *Cities of Dickinson*, 284 S.W.3d at 453 (citing *Public Util. Comm'n of Tex. v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991)). Under this deferential standard, we cannot say that the Board's interpretation of "diagnosis" is either plainly erroneous or inconsistent with the rule's language.[36] We overrule Scally's fourth and fifth issues.

---

[36] To the extent that Scally's arguments regarding the medical records' adequacy could be construed as arguments that substantial evidence does not support the findings of inadequate records, we note that each of the cited patients except T.C. had nothing more than a rule-out diagnosis in their records. While Scally recorded a diagnosis of hypogonadism for T.C. after he received the results of T.C.'s lab tests, rather than merely a rule-out diagnosis, T.C.'s medical records did not refer to any symptoms justifying Scally's original rule-out diagnosis and the tests ordered, rendering the records inadequate. T.C. had stated that his libido and sex drive were good, he exercised every day, and he had no prostate or erection problems. Scally did not indicate in T.C.'s record that T.C. had any prior history of steroid use. As the ALJ explained, "the term 'adequate' must mean something, otherwise nonsensical symptoms could support any form of treatment ordered by a doctor." We conclude that substantial evidence supports the Board's findings of inadequate records.

## CONCLUSION

Having overruled all of Scally's issues on appeal, we affirm the district court's judgment.

_____

Diane M. Henson, Justice

Before Justices Pemberton, Henson and Goodwin

Affirmed

Filed:   August 4, 2011