**Affirmed and Memorandum Opinion filed February 11, 2021.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-19-00359-CV

_____

## CHARLES THOMAS CLAYTON, M.D., Appellant

## V.

## TEXAS MEDICAL BOARD, Appellee

**On Appeal from the 345th District Court
Travis County, Texas
Trial Court Cause No. D-1-GN-15-001675**

## M E M O R A N D U M   O P I N I O N

Appellant Dr. Charles Thomas Clayton's medical license was revoked after he was convicted of eight tax offenses. Clayton sought reissuance of his medical license following the completion of his supervised release. Appellee, the Texas Medical Board (the "Board"), determined Clayton was ineligible for reissuance of his medical license and Clayton appealed. For the reasons below, we affirm.

BACKGROUND

*Procedural Framework*

In 2006, Clayton was convicted on two felony counts of filing false tax returns and six misdemeanor counts of failing to file tax returns. Clayton was sentenced to five years in prison and released in June 2011 to serve 12 months supervised release. After the government moved to revoke Clayton's term of supervised release, Clayton was resentenced to serve an additional 11 months supervised release, which concluded in June 2013.

Clayton applied for reissuance of his medical license in September 2012 and the Board denied his application. Clayton requested a hearing with the State Office of Administrative Hearings ("SOAH") to contest the Board's determination. A three-day hearing was held in January 2014 before an administrative law judge ("ALJ").

*Evidence*

Clayton was the first witness to testify at the SOAH hearing. Clayton said he is a diagnostic radiologist who was licensed to practice medicine in Texas in 1978.

Clayton testified that he pleaded guilty to one misdemeanor count of failure to timely file a federal income tax return in 1996. He said he paid a fine and was sentenced to one year probation. According to Clayton, the Board did not take any action with respect to this offense.

In 2006, Clayton was convicted on two felony counts of filing false tax returns and six misdemeanor counts of failing to file tax returns. Clayton was sentenced to five years' imprisonment. In its sentencing order, the district court noted that the sentence was "an upward variation" from the federal sentencing

guidelines given the "nature and circumstance of the offense itself", which the district court described as follows:

> Dr. Clayton prepared and filed for refunds in excess of $168,000.00 for the tax years 1997 and 1998 regarding income tax returns prepared by a CPA and signed and filed by him in [a] timely fashion. He subscribed the request for refunds under the penalties of perjury expressing [] his income was "zero" in each of these years. He deliberately and willfully refused to file income tax returns for the years 1999, 2000, 2001, 2002, 2003, and 2004, notwithstanding being advised by his CPAs, the Internal Revenue Service, and other professionals of the law [of] his obligations to file and pay income taxes. Additionally, for years [Clayton] deliberately documented and prepared for the criminal trial he knew would come by obtaining and reviewing [the] prosecutor's manual of the Department of Justice for tax cases, seeking certain documents to place in his files and requested [] names of CPAs and lawyers to be used as witnesses. He developed correspondence with government offices, elected officials, and expended large sums of money to produce a video and a compact disc with intent to induce others not to file or pay their taxes under the theory that he allegedly espoused.
>
> *          *          *
>
> [T]he record is without dispute that Dr. Clayton is above-average intelligence, highly educated, and enjoyed a successful career in practicing radiology. However, for purely vindictive reasons and personal greed, he not only deliberately took advantage of the American tax system . . . but also willfully planned and violated the law. . . . It is clear to the undersigned that Dr. Clayton has no remorse for his actions. At all times, he thought he would be acquitted by the jury because of his preparation and testimony.

After he was sentenced, Clayton entered into an agreed order with the Board whereby he agreed to the revocation of his medical license. Clayton was released from prison in June 2011 to serve 12 months under supervised release.

In June 2012, the government moved to revoke Clayton's supervised release on grounds that Clayton had "been playing a shell game with his financial

3

resources" and "provid[ing] his supervising probation officers in Houston with an incorrect statement of his monthly expenditures." The motion to revoke also asserted that, despite a reported gross income of $120,000, Clayton (1) had paid less than 2% of his $50,000 court fine, and (2) had not paid anything towards the $7,400 he owed for prosecutions costs. The motion also alleged that Clayton was engaging in numerous other accounting irregularities, including misrepresenting his income and "using his son's bank account as a nominee account to hide his true financial situation." The district court granted the motion to revoke and sentenced Clayton to an additional 11 months supervised release.

Clayton was also assigned a new probation officer, who put him on an installment plan paying $1,500 a month towards his fine and prosecution costs. Clayton paid off the entirety of the fine in November 2012 with a $65,000 loan he received from Dr. Richey, the owner of U.S. Imaging. Clayton testified that Richey had provided "enormous[]" financial help since his release from prison.

Clayton worked at U.S. Imaging both before and after his incarceration. After his incarceration, Clayton's job duties at U.S. Imaging included working on policies and procedures for various imaging studies as well as other quality assurance tasks. Since 2011, Clayton estimated that he had reviewed approximately 36,000 imaging studies through his work at U.S. Imaging. Clayton testified that, if his medical license is reissued, he plans to return to U.S. Imaging as a radiologist.

Discussing his payment arrangements with U.S. Imaging and Richey, Clayton said he had been receiving $10,000 a month: $5,600 as salary and $4,400 as a loan. Clayton testified that this payment arrangement had been in place since September 2011. Clayton was unsure exactly how much money Richey had loaned him since he was released from prison but estimated it was more than $100,000.

4

Clayton testified that he currently owes the IRS $450,000 in back taxes. Clayton said he was currently paying $150 a month towards this balance.

The ALJ also heard testimony from Dr. Edward C. Knudson, who worked with Clayton at U.S. Imaging both before and after Clayton's incarceration. According to Knudson, the work Clayton performed at U.S. Imaging after his release from prison was "[e]xtremely useful." Knudson responded affirmatively when asked if Clayton was "a good radiologist" and "able to resume the practice of radiology." Knudson agreed that it would be in the public's and Clayton's best interests to have Clayton resume his career as a radiologist.

*Decisions*

After the conclusion of the SOAH hearing, the ALJ signed a proposal for decision concluding Clayton did not meet the applicable criteria for reissuance of his medical license. The Board, in its final order, declined to make any changes to the proposal for decision and adopted the ALJ's findings of fact and conclusions of law. The Board concluded Clayton "is hereby ineligible for a Texas Medical License."

Clayton filed a petition for judicial review in the trial court. The trial court affirmed the Board's final order in its final judgment. Clayton timely appealed to the Third Court of Appeals and his case was transferred to this court by Texas Supreme Court Transfer Order.[1]

## ANALYSIS

We begin with an overview of the applicable standards of review and governing law before delving into the issues Clayton raises on appeal.

---

[1] Because of the transfer, we must decide this case in accordance with the precedent of the Third Court of Appeals if our decision otherwise would have been inconsistent with that court's precedent. *See* Tex. R. App. P. 41.3.

5

## I.      Standards of Review and Governing Law

Under the Texas Administrative Procedure Act (the "APA"), we review the Board's final order using the substantial evidence standard. *See* Tex. Gov't Code Ann. § 2001.174; *see also Scally v. Tex. State Bd. of Med. Exam'rs*, 351 S.W.3d 434, 440 (Tex. App.—Austin 2011, pet. denied). The APA authorizes reversal or remand of an agency's decision that prejudices an appellant's substantial rights because the administrative filings, inferences, conclusions, or decisions:

1.    violate a constitutional or statutory provision;
2.    exceed the agency's statutory authority;
3.    were made through unlawful procedure;
4.    are affected by other error of law; or
5.    are arbitrary or capricious or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.

Tex. Gov't Code Ann. § 2001.174(2)(A)-(D), (F); *see also Scally*, 351 S.W.3d at 440.

The APA also authorizes the court to review an agency's findings, inferences, conclusions, and decisions to determine whether "they are reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole." *Scally*, 351 S.W.3d at 440-41. Under this standard, we presume the agency's final order is supported by substantial evidence and the appellant bears the burden of proving otherwise. *Id*. at 441. "The burden is a heavy one — even a showing that the evidence preponderates against the agency's decision will not be enough to overcome it, if there is some reasonable basis in the record for the action taken by the agency." *Id*. Whether the agency's order satisfies the substantial evidence standard is a question of law. *Id*.

Substantial evidence "'does not mean a large or considerable amount of

evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact.'" *Id*. (quoting *Lauderdale v. Tex. Dep't of Agric.*, 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ)). Accordingly, we will sustain an agency's action if the evidence as a whole is such that reasonable minds could have reached the conclusion the agency must have reached to justify its action. *Id*.

We may not substitute our judgment for that of the Board concerning the weight of the evidence on questions committed to agency discretion. *Id*.; *see also* Tex. Gov't Code Ann. § 2001.174. The factfinder determines the credibility of witnesses and the weight of their testimony. *Scally*, 351 S.W.3d at 441. "We may not set aside an agency decision merely because testimony was conflicting or disputed or because it did not compel the agency's decision." *Id*.

Under Texas Occupations Code section 164.151, the Board "may reissue a license to practice medicine to a person whose license has been canceled, revoked, or suspended." Tex. Occ. Code Ann. § 164.151(a). "[T]o be eligible for reinstatement or reissuance of a license an applicant must prove that the reinstatement or reissuance is in the best interests of: (1) the public; and (2) the person whose license has been canceled, revoked, or suspended." *Id*. § 164.151(c).

The Texas Administrative Code provides further guidance regarding these "best interest" requirements, which we discuss in detail below. *See* 22 Tex. Admin. Code §§ 167.4-167.5 (Tex. Med. Bd., Reinstatement and Reissuance).

## II.     Clayton's Issues on Appeal

Clayton raises three issues on appeal:

1.      Clayton "met the statutory and regulatory requirements for re-issuance of his medical license."

2.      The Board's decision to deny the reissuance of Clayton's license is

"not legally authorized."

3. The Board "should be estopped from denying re-issuance of Dr. Clayton's license to practice medicine."

In his first issue, Clayton discusses the "best interest" requirements and asserts the evidence presented at the SOAH hearing satisfied these standards. We consider this issue in conjunction with part of Clayton's second issue, in which he argues that the Board's "best interest" determinations are not supported by substantial evidence.

We then proceed to examine the remainder of Clayton's second issue and his contention that certain findings of fact and conclusions of law are arbitrary and capricious. Finally, we consider Clayton's argument that the Board should be estopped from denying reissuance of his license.

## A. The Board's "Best Interest" Determinations Are Supported by Substantial Evidence.

### 1. Best Interests of the Public

Under the Texas Administrative Code, the "[b]est interests of the public determination shall include: consideration and examination of the underlying action that led to the revocation in case of a physician whose license was revoked." *See* 22 Tex. Admin. Code § 167.4(1) (Tex. Med. Bd., Best Interests of the Public). This determination also "may include, but not be limited to, an assessment by the Board as to whether the physician demonstrates:

(A) remediation of any competency, technical, educational, training or ethical limitations as found in the order leading to revocation or suspension of a license or any competency, technical, educational, training or ethical limitations found since the entry of the order;

(B) that risk of further disciplinary proceedings for the revocation or suspension of the license will be minimal or minimized if the physician is returned to the practice of medicine and the public

8

will adequately be protected, whether by probationary order or other terms and conditions as agreed to by the physician or authorized by § 164.101 and § 164.102 of the Act;

(C) that an adequate practice plan will be in place to reduce or eliminate the risk of further disciplinary proceedings by the board;

(D) continued medical competency such that the physician is able to provide the same standard of medical care as any applicant for a license under Chapter 163 of this title (relating to Licensure). Further, the board shall require an applicant for reissuance to meet the qualifications and requirements set forth in Chapter 163 of this title, including, but not limited to documentation of completion of the process of a current application for licensure; and

(E) that the physician's services are needed and would benefit the citizens of Texas.

*Id.* § 167.4(2)(A)-(E).

In its final order, the Board concluded Clayton "failed to prove that the reissuance of his license is in the public's . . . best interests." Asserting that this conclusion is not supported by substantial evidence, Clayton points to certain evidence as summarized below:

- Clayton paid his debt to society and no longer has any involvement in the criminal court system. Clayton testified that he learned "[d]on't try to interpret the [IRS] regulations and do it yourself."

- Clayton explained what it was like to be in prison and that he "learned his lesson." Clayton said he will "never" make the same mistakes again.

- Clayton has completed a substantial amount of work at U.S. Imaging since his incarceration. Clayton has a practice plan in place and will return to U.S. Imaging as a radiologist if his license is reissued.

- Knudson testified that Clayton's work at U.S. Imaging has been "[e]xtremely useful." Knudson testified that Clayton was a good radiologist and that it would be in the public's best interests if

9

Clayton's license was reissued.

Considered in conjunction with the rest of the administrative record, this evidence does not show that the Board's "best interests of the public" determination lacks substantial evidence. *See Scally*, 351 S.W.3d at 440-41. Clayton relies heavily on his testimony at the SOAH hearing that he "learned his lesson" and will "never" commit the same actions that led to his convictions. But it was within the factfinder's discretion to determine the credibility of these assertions and the weight to be afforded to them. *See id*. at 441. The factfinder weighed these statements against other evidence suggesting the reissuance of Clayton's license was not in the public's best interests and found the latter more convincing under these facts; we decline to disturb this determination on appeal.

The record also contains substantial evidence supporting the Board's conclusion that reissuance of Clayton's license was not in the public's best interests. Specifically, the Board reasonably could have found that Clayton has not remediated the ethical issues preceding the revocation of his license and is at risk of further disciplinary proceedings. *See* 22 Tex. Admin. Code § 167.4(2)(A), (B) (Tex. Med. Bd., Best Interests of the Public).

The district court's sentencing order notes that Clayton engaged in a "deliberate[] and "willful[]" course of conduct whereby he refused to pay taxes despite the advice of CPAs, the IRS, and other professionals. The order also states that Clayton documented and prepared for a criminal trial stemming from these actions and encouraged others "not to file or pay their taxes under the theory that he allegedly espoused."

When asked about the statements in the sentencing order regarding his willful failure to file taxes, Clayton responded:

Well, it appears in [the sentencing] order, but I concluded that I didn't

owe income taxes and that's why I didn't file. Nobody — the IRS did not — there's nothing that exists that says the IRS says you're required to file. There's no tax professional advice. There's nothing.

Clayton also asserted that "[t]he tax professionals [his] entire career have made mistakes." Contrary to the statements in the sentencing order, Clayton testified that he did not have any professionals advise him that he was required to pay taxes.

This pattern of conduct appears to have continued after Clayton was released from incarceration. In its motion to revoke Clayton's supervised release, the government alleged Clayton made little progress paying his fine and court costs despite earning approximately $120,000 a year; the motion also alleged numerous other accounting irregularities. The district court's order revoking Clayton's supervised release and sentencing him to an additional 11 months supervised release suggest these allegations have merit.

Clayton said he was "surprised" when the government moved to revoke his supervised release. Discussing the motion's allegations regarding the fine and court costs, Clayton said his probation officer had instructed him to pay only $25 a month towards the balance owed. Clayton also pointed out that his probation officer had recommended that Clayton be permitted to come off his supervised release as originally scheduled. When asked generally about the other allegations in the motion to revoke, Clayton said "[n]one of this was true." Clayton said he did not misrepresent his income and that his "son handled the financial stuff."

Clayton's testimony at the SOAH hearing also suggests that some of his current financial arrangements remain questionable. Clayton testified that he had received over $100,000 in loans from Richey, including $65,000 to pay his fine and prosecution costs as well as a $4,400 monthly loan. Clayton said these loans were neither documented nor due by a particular date and that he planned to pay

11

them back "[w]hen [he] can." Despite acknowledging that the loans "might never get paid back", Clayton categorically denied owing taxes on the monthly $4,400 payment because "[i]t's a loan."

At another point in his testimony, Clayton said he had a written promissory note with Richey that included the $4,400 monthly payments. Clayton testified that the note did not include the $65,000 Richey loaned him to pay off the fine and prosecution costs stemming from his convictions.

Clayton also testified that he currently owes approximately $450,000 in back taxes. Clayton said he was currently paying $150 a month towards this liability. Clayton testified that, according to "what the IRS says," he will no longer have to back his back taxes once the "two years remaining on the Statute of Limitations" run.

This evidence, considered as a whole, would permit reasonable minds to conclude the public's best interests would not be served by the reissuance of Clayton's medical license. *See Scally*, 351 S.W.3d at 441. The Board reasonably could have concluded that Clayton has engaged in a pattern of questionable financial behavior that has continued well after his convictions and the completion of his prison sentence and supervised release. Therefore, we overrule Clayton's challenge to the Board's "best interests of the public" determination.

### 2. *Best Interests of the Physician*

With respect to the "best interests of the physician" determination, the Board's decision "may include, but not be limited to, an assessment by the Board as to whether the physician:

(1)  understands all issues of competency, technical, educational, training or ethical limitations as found in the order which led to the revocation or suspension of a license; and

12

(2) demonstrates that risk of further disciplinary proceedings for the revocation or suspension of the license of the physician will be minimal or minimized if the physician is returned to the practice of medicine.

22 Tex. Admin. Code § 167.5(1), (2) (Tex. Med. Bd., Best Interests of Physician).

In its final order, the Board concluded Clayton "failed to prove that the reissuance of his license is in . . . his best interests." Asserting that this conclusion is not supported by substantial evidence, Clayton points to the same evidence discussed above with respect to the Board's "best interests of the public" determination. Clayton also points to evidence showing (1) the toll his imprisonment took on his family, and (2) that the original revocation order had nothing to do with Clayton's competence as a physician or his ability to practice medicine.

Based on the evidence discussed above, however, the Board reasonably could have concluded that Clayton (1) did not understand the ethical issues that led to the revocation of his license, and (2) did not demonstrate that the risk of further disciplinary proceedings will be minimized if he returns to practice. *See id.* In his testimony, Clayton continued to challenge findings and conclusions made with respect to his convictions and the revocation of his supervised release. Clayton also downplayed some of his current financial irregularities and continued to assert his interpretations of what the Tax Code requires with respect to his earnings and the loans he received from Richey. The administrative record, considered as a whole, would permit reasonable minds to conclude Clayton's best interests would not be served by the reissuance of his medical license. *See Scally*, 351 S.W.3d at 441.

We overrule Clayton's challenge to the Board's "best interests of the physician" determination.

13

**B. The Challenged Findings and Conclusions Are Not Arbitrary or Capricious.**

Clayton argues that the following findings of fact ("FOF") and conclusions of law ("COL") in the Board's final order are arbitrary and capricious:

FOF 15    Dr. Clayton did not adequately address the U.S. Attorney's allegations and did not adequately explain why, if his actions were completely innocent, [District Court] Judge Sparks chose to extend the supervised release period.

FOF 16    Dr. Clayton's testimony at the hearing, that his actions were not willful and were not contrary to the advice of tax professionals, did not comport with Judge Sparks's findings in the 2006 case.

FOF 17    The evidence did not show that Dr. Clayton has remediated any ethical limitations found in the revocation order or since the entry of the order.

FOF 18    Dr. Clayton failed to show that the risk of further disciplinary proceedings would be minimized, because he failed to prove he would not engage in further financial improprieties.

COL 6    Dr. Clayton's criminal convictions can be considered in determining whether reissuance is in the public's and Dr. Clayton's own interests under 22 Texas Administrative Code (TAC) §§ 167.4 and 167.5.

COL 9    Dr. Clayton failed to prove that he has remediated the ethical limitations found in the order leading to revocation or ethical limitations found since the entry of the order, as required by 22 TAC § 167.4(1).

COL 10    Dr. Clayton failed to prove that the risk of further disciplinary proceedings for the revocation or suspension of the license will be minimal or minimized if he is returned to the practice of medicine, as required by 22 TAC § 167.4(2) and .5(2).

COL 12    Dr. Clayton failed to prove that the reissuance of his license is in the public's and his best interests as those terms are defined by the Board's rules.

14

FOF 17 and 18 and COL 9, 10, and 12 address determinations relevant to and subsumed within the best interest analyses discussed above in section II.A. In that section, we concluded that the Board's "best interest" determinations were supported by substantial evidence. Clayton does not raise any new challenges to FOF 17 and 18 and COL 9, 10, and 12 that warrant revisiting them. We overrule Clayton's challenges to FOF 17 and 18 and COL 9, 10, and 12.

FOF 15 states that Clayton did not adequately explain why the district court extended his supervised release period after the government filed its motion to revoke. This finding is neither arbitrary nor capricious. At the SOAH hearing, Clayton was questioned regarding the basis for the government's motion to revoke and, in response, generally asserted that "[n]one of this was true." With respect to his $25 a month payment towards the $57,000 he owed in fines and prosecution costs, Clayton asserted that he was doing what his probation officer instructed him to do (despite his $120,000 annual salary). The Board reasonably could find that these explanations were inadequate concerning the reasons the district court extended his supervised release.

FOF 16 states Clayton's testimony that the actions underlying his convictions were "not contrary to the advice of tax professionals" and did not comport with the district court's sentencing order. As discussed above in Section I.A.1., this is an accurate reflection of Clayton's testimony on this point. Therefore, FOF 16 is neither arbitrary nor capricious.

COL 6 discusses factors that may be considered pursuant to 22 Texas Administrative Code sections 167.4 and 167.5. These sections were discussed in detail above; both suggest the factfinder, when determining whether to reissue a medical license, consider the ethical limitations and disciplinary proceedings that preceded revocation of the license. *See* 22 Tex. Admin. Code §§ 167.4(2)(A), (B),

15

167.5(1), (2) (Tex. Med. Bd., Reinstatement and Reissuance). Clayton's criminal convictions are relevant to these determinations. COL 6 is neither arbitrary nor capricious.

We overrule Clayton's challenges to FOF 15, 16, 17, and 18 and COL 6, 9, 10, and 12.

### C. Estoppel Does Not Apply to the Board's Actions.

In his final issue, Clayton contends that "the Board should be estopped from denying [his] application for reissuance of his medical license" because "the Board misrepresented its true intent, which was to never re-issue [his] license no matter what steps he took or what requirements he met." Clayton asserts the Board knew "full well that it never intended to reissue" his license but nonetheless asked him "to jump through hoop after hoop over a three-year period" as he completed the reissuance process.

To support this contention, Clayton relies on the elements necessary to establish equitable estoppel. Under this doctrine, "a party is precluded, due to its voluntary conduct, from asserting rights it might otherwise possess against another person who has relied on the party's conduct to change his position for the worse." *Comiskey v. FH Partners, LLC*, 373 S.W.3d 620, 637 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). Equitable estoppel requires evidence of:

1.  a false representation or concealment of material facts;

2.  made with actual or constructive knowledge of those facts;

3.  with the intention that it should be acted on;

4.  to a party with knowledge, or the means of knowledge, of those facts;

5.  who detrimentally relied upon the misrepresentation.

16

*Id.*

Clayton's estoppel argument relies on the 2007 agreed order he entered into with the Board, by which he agreed to the Board's revocation of his medical license. The agreed order is premised on Texas Occupations Code section 164.057, which requires revocation of a physician's license upon final conviction of a felony. *See* Tex. Occ. Code Ann. § 164.057(b). The agreed order states:

> If upon termination of his incarceration, [Clayton] wishes to seek re-issuance of his Texas Medical License, [Clayton] must comply with all applicable statutes and rules, including but not limited to, Section 164.151 of the Medical Practice Act, and Board Rule 167, related to Reinstatement and Reissuance of Licenses.

The agreed order is clear that Clayton could seek reissuance of his license after he completed his period of incarceration — it does not guarantee that his medical license would be reissued. Accordingly, the agreed order does not support Clayton's estoppel argument.

We overrule Clayton's final issue.

## CONCLUSION

We overrule Clayton's issues on appeal and affirm the trial court's February 15, 2019 final judgment.

/s/    Meagan Hassan
Justice

Panel consists of Chief Justice Christopher and Justices Jewell and Hassan.