# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00321-CV

---

**Employees Retirement System of Texas and
Minnesota Life Insurance Company, Appellants**

**v.**

**LaRae Walker, Appellee**

---

### FROM THE 345TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-19-002744, THE HONORABLE JAN SOIFER, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

The Employees Retirement System of Texas (ERS) and Minnesota Life Insurance Company appeal from the trial court's judgment that reversed ERS's decision to deny LaRae Walker's claim for accidental-death benefits and ordered Minnesota Life to pay the claim. On review, we must determine whether substantial evidence supports ERS's conclusion that Walker's husband (Decedent) was intoxicated, which substantially contributed to his decision to attempt to cross a busy freeway on foot. We conclude that it does and accordingly reverse the trial court's judgment and render judgment affirming ERS's order.

## PROCEDURAL BACKGROUND

Walker, an employee of the State of Texas, purchased Dependent Voluntary Accidental Death and Dismemberment (AD&D) Insurance under the Renewable Group Term Life Insurance policy established by the ERS Board of Trustees and administered by Minnesota

Life.  The policy covers loss of life as a direct result of accidental bodily injury to the employee or dependent.  Walker's spouse was a dependent and insured under the policy.  On April 22, 2015, at about 6:15 a.m., Walker's spouse attempted to walk across Interstate Highway 635 in Dallas and was struck by five cars and killed.  The autopsy report indicated that Decedent's blood contained methamphetamine and cocaine metabolites.

Walker filed a claim for accidental-death benefits with Minnesota Life, which determined that the policy excluded her spouse's death from coverage pursuant to a clause providing that the policy "does not cover any loss caused by, resulting from or substantially contributed to by . . . [t]he insured individual being intoxicated by reason of alcohol or drug use, or a combination thereof."  The policy defined "intoxication" as in Section 49.01 of the Texas Penal Code.  *See* Tex. Penal Code § 49.01 (defining term, relevantly, to mean "not having the normal use of mental or physical faculties by reason of the introduction of . . . a controlled substance, a drug, a dangerous drug, [or] a combination of two or more of these substances").  After Minnesota Life denied her claim, Walker appealed to ERS, which concurred with the denial.

Walker requested a contested-case hearing before the State Office of Administrative Hearings (SOAH).  At the hearing, Walker had the burden by a preponderance of the evidence to prove that she was entitled to benefits under the policy.  *See* Tex. Ins. Code § 1551.357(d); 34 Tex. Admin. Code § 67.55(b) (2022) (Employees Retirement Sys., Ord. of Proc.).  The administrative law judge (ALJ) concluded that Walker failed to prove that the intoxication exclusion does not apply and did not prove that she is eligible to receive the accidental-death benefits for the death of her spouse.  The ERS Executive Director entered an order adopting the ALJ's findings of fact and conclusions of law, concurring that Walker was not

2

eligible for accidental-death benefits. Walker filed a motion for rehearing, which was overruled by operation of law.

Walker filed a suit for judicial review in the trial court challenging ERS's final order. *See* Tex. Ins. Code § 1551.359 (providing right to judicial review for person aggrieved by ERS final decision and for "substantial evidence" standard of review). After a hearing on the merits, the trial court reversed ERS's decision and ordered Minnesota Life to pay Walker the claim. ERS and Minnesota Life perfected this appeal.

## EVIDENCE ADMITTED BY THE ALJ

The ALJ admitted the depositions of the following persons: Stephen Hastings, M.D., a pathologist and the medical examiner who performed the autopsy on Decedent; Ross Stedman, the claims manager of the AD&D program for Minnesota Life; and Jon Rod McCutcheon, a forensic toxicologist. Documentary exhibits admitted included Decedent's autopsy report and certified death certificate, both of which were attached to Dr. Hastings's deposition; McCutcheon's toxicology report, which was based on the autopsy toxicology results and was attached to his deposition; and the police report from the incident causing Decedent's death.

### *Autopsy report and death certificate*

The autopsy report is signed by Dr. Hastings as well as Tracy Dyer, M.D., Medical Examiner, and Jeffrey Barnard, M.D., Director and Chief Medical Examiner of the Dallas County Medical Examiner's Office. It reports the manner of death—"accident"—and states that "[b]ased on the case history and autopsy findings, it is our opinion that [Decedent] . . . died as a result of blunt force injuries." The toxicology portion of the report indicates the

3

following substances in Decedent's blood: (1) methamphetamine (0.91 mg/L), (2) amphetamine (0.06 mg/L) (together listed under the subheading "Alkaline Quantitation"), (3) ecgonine methyl ester (0.026 mg/L), and (4) benzoylecgonine (0.116 mg/L) (together listed under the subheading "Cocaine and Metabolites"). The certified death certificate identifies the "immediate cause" of death as "blunt force injuries" and the manner of death as "accident." Although it contains a space for adding "significant conditions contributing to death," that space is blank.

*Police report*

The police report narrates that Decedent, "a pedestrian, was attempting to cross the westbound traffic lanes of L.B.J. Frwy. from south to north," and that a car traveling in the second lane from the left "collided" with him, after which Decedent "was vaulted into the air," "fell to the roadway," and "was subsequently run over by" four other cars traveling westbound on the roadway. The narrative concludes, "This report had been marked incomplete pending an analysis of a specimen of the pedestrian's blood." No further evidence from the police department was admitted.

*Medical examiner's deposition*

Dr. Hastings performed the autopsy the day after Decedent's death, within the usual period from which an examiner can generally "get a pretty good idea of what's going on with someone." The extensive, severe injuries to Decedent's body were "consistent with a pedestrian getting hit by a motor vehicle or multiple motor vehicles" and with the information Dr. Hastings had received from investigative sources that medical examiners typically consult before performing an autopsy.

4

Dr. Hastings explained that medical examiners at his office routinely order a toxicology report for every autopsy performed, and that in some cases the report is helpful to determine "what caused the death of the person." He testified that Decedent's toxicology report showed the presence of methamphetamine, amphetamine, ecgonine methyl ester, and benzoylecgonine in his blood. Methamphetamine and amphetamine are "intoxicating substances," and the former is an illegal drug, while the latter "can either be a metabolite of methamphetamine or . . . a prescription drug." Dr. Hastings explained that when cocaine is metabolized by the body, the two substances identified in the toxicology screen as ecgonine methyl ester and benzoylecgonine will be present. Those two cocaine metabolites cannot "show up" on a toxicology report if someone "doesn't take cocaine."

Dr. Hastings did not deem the toxicology results "relevant" "as far as the cause and manner of death." Because of Decedent's "extensive blunt force injuries," the toxicology substances were not listed as "contributory" to the cause and manner of death. Dr. Hastings did not attribute any of the drugs found in Decedent's blood "to causing his death" and would only include such information when "there's nothing else [to explain] [a] cause of death," such as when someone is "found dead with a syringe in their arm." When asked whether Decedent had "levels of drugs that would cause death," Dr. Hastings responded, "There's no safe amount of methamphetamine. So methamphetamine can cause death at really any dosage." He made the same statement with respect to cocaine and stated that there is no "therapeutic level" for methamphetamine. The autopsy revealed that Decedent was alive when he suffered the blunt-force injuries and had not died (such as from drug overdose) before then.

Dr. Hastings testified that the drugs present in Decedent's system when he died could cause someone to "become agitated, delirious, unaware of their surroundings, have

5

decreased spatial awareness, [and] not be able to walk straight." However, he further testified, the drugs found in Decedent's system affect individuals differently and that, absent evidence documenting how a person was acting, one could not discern a person's level of impairment from the toxicology results alone. Dr. Hastings testified that Decedent's death did "not result" from intoxication, as defined in the Texas Penal Code, and that intoxication did not "substantially contribute" to his death. However, Dr. Hastings clarified that, as a medical examiner, he is not charged with determining how an incident or accident occurs and that generally he is "looking at the immediate cause of death." He also did not have an opinion "one way or the other" about whether intoxication led to the incident where [Decedent] was killed." Typically, he would not "look into" what led to an incident causing death "unless it's a suspected homicide or something along those lines." From his point of view as the medical examiner, in conducting autopsies, he focuses on the "immediate cause of death." Although his office routinely performs toxicology tests, those results "won't be relevant" to "cause of death" as noted in autopsy reports except in cases such as drug overdose or homicide. He also does not generally "form a conclusion" about whether someone was intoxicated in a case such as this.

Dr. Hastings testified that methamphetamine and cocaine are central-nervous-system stimulants, and that Decedent had taken both "at some point" before his death. He could not say that Decedent was not intoxicated at his time of death or that intoxication did not lead to the events that caused his death. He testified that both drugs can cause "euphoria, excitation and a rapid flow of thoughts," a "heightened sense of well-being," "irrational behavior," hallucinations, psychosis, symptoms of schizophrenia, and the "ill advised" decision to "attempt to cross the LBJ Freeway on foot." One's attempting to cross the interstate on foot might be due to his not having his "normal mental faculties," but because Dr. Hastings did not

6

see Decedent before he died, he could not determine his "degree of intoxication," and he would not assume that Decedent was acting "crazy, schizophrenic, or strange[ly]" merely because he had drugs in his system.

*Forensic toxicologist's deposition*

McCutcheon is certified by the American Board of Forensic Toxicology and has previously served as the chief forensic toxicologist in both the Travis County and Bexar County Medical Examiner's Offices. While serving in those roles, he had been called to testify in criminal and civil proceedings to "interpret the findings of whatever drug that was present or alcohol that was present" in a person's system and "how that might affect the persons, whether it caused impairment, or if it could have been the cause of death in an overdose situation." McCutcheon reviewed the autopsy here, specifically the toxicology results, and testified that "it was fair" to conclude that Decedent had ingested both methamphetamine and cocaine in the hours preceding his death.

Methamphetamine is a central-nervous-system stimulant that has some therapeutic use as a prescription drug for narcolepsy and attention-deficit disorder; however, it is more commonly used as an illicit drug. A therapeutic dosage would have "a fairly low concentration" in the range of 0.02 to 0.05 mg/L, with "some literature" indicating that it can range "up to .2" mg/L. Decedent's concentration (of 0.91 mg/L) was higher than the therapeutic concentration and "is consistent with what has been shown in the literature to be an abuse level or an abuse concentration." McCutcheon identified the "literature" and sources he reviewed to complete his report, and he stated that they are the types of information upon which experts such as himself rely for information about drugs.

7

He testified that, in his capacity as a forensic toxicologist, he is familiar with what effect methamphetamine can have on someone if it is abused: being "more awake"; feelings of excitement, euphoria, heightened awareness, or paranoia; speeding thoughts; sometimes violent behavior; and an increase in blood pressure and heart rate. Additionally, people who have been observed with abuse concentrations have exhibited irrational, aggressive, impulsive, and risky behavior (e.g., high-speed driving); rapid speaking; and incoherent thinking. Cocaine is also a central-nervous-system stimulant and can have the same effects in terms of impulsiveness and risk-taking behavior.

Based on the toxicology findings in the autopsy report, McCutcheon concluded that Decedent was intoxicated at the time of his death. His report states, "In my opinion, within reasonable toxicological possibility, [Decedent] had lost the normal use of his mental and physical faculties, due to the methamphetamine in his system, at the time of his death." He stated that he is familiar with the LBJ Freeway in North Dallas, which ranges between six and eight lanes across in the area where Decedent was found and believes that it "would be foolish to try to cross it on foot" and that attempting to do so is both "ill-advised" and "consistent with someone who does not have his or her normal mental faculties." He opined that Decedent's intoxication substantially contributed to his death. He stated the bases for his conclusion: the amount of methamphetamine in Decedent's blood, indicating that he was intoxicated at the time of death, and the "circumstantial situation indicated by" the police report indicating that "[s]omething was affecting [Decedent's] perception and his decision-making at that time to try to cross the very busy freeway." He explained that even if Decedent in a sober state had impulsive and irrational tendencies, his intoxication would have increased them. Due to the high concentration of methamphetamine in Decedent's system, "there definitely will be significant

8

effects from the drug." However, McCutcheon admitted that he did not know how Decedent was acting just before trying to cross the freeway, what his usual sober state of behavior or risk-taking level was, or what level of tolerance to methamphetamine he may have acquired.

### *Claims manager's deposition*

Stedman made the decision for Minnesota Life to deny Walker's claim. He testified that he and his staff rely on medical doctors, toxicologists, and other medical professionals in making such decisions. In this case, the decision was based on a records review by Dr. Battis, a medical doctor employed by Minnesota Life. In an entry in the claim file, Dr. Battis noted: "The toxicology reveals [Decedent] had cocaine and methamphetamine both of which would have rendered him not to have the normal use of his mental faculties" and that such intoxication "should have also been listed in the [death certificate] as a contributing cause based upon these records."

### DISCUSSION

The immediate cause of Decedent's death is undisputed—blunt-force injuries from being hit by one or more vehicles on the freeway as he attempted to cross it on foot. The dispute lies in whether ERS could reasonably have concluded that the undisputed levels of illegal drugs in Decedent's system at the time of his death caused him to be intoxicated and that such intoxication substantially contributed to his death. The ALJ concluded that McCutcheon's testimony established that Decedent was intoxicated and that it was "reasonable to infer" that his intoxication "caused or substantially contributed to his decision to cross the freeway, which in turn led to his death." He further concluded that Walker was unable to meet her burden of proof to establish that Decedent "either was not intoxicated or that his intoxication did not substantially

9

contribute to his decision to cross the freeway." She therefore "failed to prove" that the policy exception did not apply and that she is eligible to receive the AD&D benefits.

### *Standard of review*

The "substantial evidence" standard of review authorizes reversal or remand of an agency decision that prejudices the appellant's substantial rights because the administrative findings, inferences, conclusions, or decisions (1) violate a constitutional or statutory provision, (2) exceed the agency's statutory authority, (3) were made through unlawful procedure, (4) are affected by other error of law, or (5) are arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. Tex. Gov't Code § 2001.174. It also authorizes a reviewing court to test an agency's findings, inferences, conclusions, and decisions to determine whether they are reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole. *Id.* § 2001.174(2)(e); *Scally v. Texas State Bd. of Med. Exam'rs*, 351 S.W.3d 434, 440–41 (Tex. App.—Austin 2011, pet. denied). Under this deferential standard, we presume that the Board's order is supported by substantial evidence, and Walker bears the burden of proving otherwise. *See Scally,* 351 S.W.3d at 440–41. "The burden is a heavy one—even showing that the evidence preponderates against the agency's decision will not be enough to overcome it, if there is some reasonable basis in the record for the action taken by the agency." *Id.* at 441 (citing *Texas Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 453 (Tex. 1984)). Our ultimate concern is the reasonableness of the agency's order, not its correctness. *Id.* "The crux of a substantial evidence analysis is whether the agency's factual findings are reasonable in light of the evidence from which they were purportedly inferred." *Granek v. Texas State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 778 (Tex.

10

App.—Austin 2005, no pet.) (internal quotation omitted). Therefore, if there is evidence to support either affirmative or negative findings on a specific matter, the decision of the agency must be upheld. *Charter-Med. Dall.*, 665 S.W.2d at 453.

Whether the agency's order satisfies the substantial-evidence standard is a question of law. *Scally*, 351 S.W.3d at 441. Thus, the trial court's judgment that there was not substantial evidence supporting the Board's final order is not entitled to deference on appeal. *Id.* On appeal from the trial court's judgment, the focus of our review, as in the trial court, is on the Board's decision. *Id.* We review the Board's legal conclusions for errors of law and its factual findings for support by substantial evidence. *Id.* Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact." *Id.* (citation omitted). Although the evidence must amount to more than a mere scintilla, "the evidence in the record may preponderate against the agency decision and still amount to substantial evidence." *Poole v. Karnack Indep. Sch. Dist.*, 344 S.W.3d 440, 443 (Tex. App.—Austin 2011, no pet.). Thus, we will sustain the agency's decision if the evidence as a whole is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action. *Scally*, 351 S.W.3d at 441.

*Analysis*

On this record, we conclude that ERS could reasonably have concluded that Decedent was intoxicated and that his intoxication substantially contributed to his death. Therefore, its decision that Walker had not proved that she was entitled to benefits is supported

by substantial evidence, and the trial court erred in concluding otherwise and reversing ERS's decision.

We first address Walker's argument that McCutcheon's deposition testimony should not have been considered because he was "not qualified to render any opinion in this case" because he is not a doctor and could not opine as to the cause of Decedent's death based on a "reasonable medical probability." *See* 34 Tex. Admin. Code § 67.69(b) (2022) (Employees Retirement Sys., Rules of Evidence) (noting that "opinion evidence of a medical condition or cause must be based on reasonable medical probability and supported by objective medical evidence"). However, Walker did not object to McCutcheon's testimony when it was admitted, and the ALJ was free to consider it. *See Dyer v. Commission on Env't Quality*, 639 S.W.3d 721, 734 (Tex. App.—Austin 2019) (noting that evidence admitted at contested-case hearing without objection was properly considered by ALJ), *aff'd*, 646 S.W.3d 498 (Tex. 2022); Tex. Gov't Code § 2001.081 (noting that rules of evidence "as applied in a nonjury civil case in a district court of this state shall apply to a contested case"); Tex. R. Evid. 103(a) (stating that to preserve claim of error about admission of evidence, party must timely object or move to strike and state specific ground for objection unless it is apparent from context); *see also City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009) (holding that scientific opinions admitted without objection may be considered probative evidence "even if the basis for the opinion is unreliable"); Tex. R. Evid. 702 (stating that expert witness may testify "in the form of an opinion" if his specialized knowledge will help trier of fact understand evidence or determine fact in issue). However, even had Walker preserved the issue for review, we would conclude that the ALJ did not err in considering McCutcheon's testimony—specifically his conclusion that Decedent was intoxicated—because courts routinely accept the testimony of non-M.D. forensic toxicologists to

12

establish whether a person was intoxicated. *See, e.g.*, *Haley v. State*, 396 S.W.3d 756, 766 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (affirming trial court's ruling that toxicologist's testimony was reliable where expert opined that appellant's blood-methamphetamine level of 0.80 mg/L was "so high" that his coordination, attention, and driving-ability must have been affected and contributed to accident). We thus proceed to consider the reasonableness of ERS's decision based on the evidence as a whole.

The evidence showed that Decedent had high levels of methamphetamine (more than four times the highest possible therapeutic level—i.e., an "abuse level") and cocaine metabolites in his system when he attempted to cross the busy freeway. He had used both illegal substances within hours of doing so. Methamphetamine and cocaine, used separately or combined, have various physical and mental effects, including irrational, impulsive, and risk-taking behavior; hallucinations; paranoia; inability to walk straight; and incoherent thinking. With the high methamphetamine levels present in Decedent's blood, McCutcheon believed that Decedent had lost the normal use of his physical and mental faculties. While Dr. Hastings would not opine on whether he believed that Decedent had lost the use of his physical and mental faculties, he explained that his duties do not typically entail such conclusions but merely the determination of the direct cause and manner of death. Both experts agreed that crossing the busy freeway on foot would be ill-advised and consistent with someone functioning without his normal use of mental faculties. Although it was her burden to prove that the intoxication-exclusion did not apply, Walker offered no evidence to explain why her husband might have attempted to cross the freeway or what his prior drug usage or sober behavior were like, such as to demonstrate, for example, that his drug use had not impaired his physical and mental faculties.

Although it is undisputed that the immediate cause of Decedent's death was the blunt-force injuries he sustained from cars, the AD&D policy excludes loss not only "caused by" intoxication but also which is "resulting from or substantially contributed to" by intoxication. When drug use is not the direct cause of death (such as in overdose cases), circumstantial evidence may be offered to prove that drug-induced impairment has substantially contributed to the accident that directly results in death. *See Dutka ex rel. Estate of T.M. v. AIG Life Ins.*, 573 F.3d 210, 214 (5th Cir. 2009) (affirming insurer's decision that plane crash resulted "in part" from pilot's intoxication because circumstantial evidence, including nature of accident itself and absence of evidence of mechanical failures or poor visual conditions, supported such finding). On this record, it is a reasonable inference that Decedent did not have "the normal use of [his] mental or physical faculties by reason of the introduction of . . . drug[s] … into [his] body" and that such condition "substantially contributed" to his death. Therefore, we hold that substantial evidence supports ERS's conclusion that Walker did not prove her entitlement to accidental-death benefits, *see Scally*, 351 S.W.3d at 441, and we sustain ERS's and Minnesota Life's respective first issues.[1]

## CONCLUSION

Having sustained ERS's first issue and Minnesota Life's sole issue, we must reverse the trial court's judgment and render judgment affirming ERS's final order.

---

[1] We therefore need not address ERS's second issue, in which it contends that the trial court violated the "separation of powers doctrine" by reversing the ERS order without first "finding an error in the decision" and remanding the cause to the agency to correct the error. *See* Tex. R. App. P. 47.1.

14

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Triana

Reversed and Rendered

Filed:   September 14, 2022